ARAPAHOE CATTLE & LAND CO. v. STEVENS.

1. CORPORATION — PROPOSITION OF OFFICERS FOR LOAN.— A proposition by the officers of a private corporation to pay a party $5,000 in the stock of the company for his services, if he would procure a loan of $15,000 for the use of such company, or a proportionate amount of stock for a smaller loan, duly accepted and acted on, warrants the finding of an agreement to pay such party, in the capital stock of the corporation, thirty-three and one-third per cent. of any sum he could procure to be loaned it; also, that the officers acted in behalf of the corporation, although the president testified that the stock was to be furnished by the officers individually.

2. PERFORMANCE OF CONDITIONAL AGREEMENT.— A loan of $5,000, procured by such agent for the corporation on condition that in addition to the note of the corporation the officers thereof individually would execute a note for the same, which they did and the money was obtained, is a fulfillment of the conditional agreement on part of the agent.

3. VALIDITY OF CORPORATE CONTRACTS — SPECIAL POWERS.— Such a contract was within the scope of the authority of the officers of the corporation, by virtue of the facts that the company was organized to buy and sell land, cattle, etc., and to do all business incidental to stock-raising; the president and secretary being duly empowered to purchase certain ranches, with the horses and stock thereon.

4. BY-LAW NO DEFENSE TO CORPORATE CONTRACT UNLESS NOTICE THEREOF GIVEN.— Where a contract entered into between the officers of a corporation and a third party is within the scope of the authority conferred on the officers by the articles of incorporation,

but conflicts with a by-law, of which the other party had no notice, the latter is entitled to have the contract enforced.

5. STOCK OF CORPORATION MAY BE ISSUED IN PAYMENT OF SERVICES — AGREEMENT TO PAY EXTRAVAGANT PRICE FOR SERVICES.— A corporation may issue shares of its stock in payment for services rendered to it; and, where an agreement so to do is entered into in good faith, the fact that the result shows that the price agreed to be paid is extravagant does not of itself furnish a ground to release the corporation from its contract, particularly where no claim is made that the contract is prejudicial to creditors.

*Appeal from Superior Court of Denver.*

APPELLEE, as plaintiff, filed his complaint in the superior court, alleging: (1) The corporate existence of defendant, the present appellant. (2) That in February, A. D. 1884, the said defendant, desiring to borrow the sum of $15,000, then and there agreed with the plaintiff, in consideration of his procuring for said defendant company a loan of such or a less sum of money, to pay to him, for procuring the same, thirty-three and one-third per cent. of any such sum so as aforesaid by him procured to be loaned to it, to be paid to the plaintiff in shares of the capital stock of the said The Arapahoe Cattle & Land Company, of equal amount; that then and there plaintiff procured to be loaned to said defendant the sum of $5,000, which said defendant then and there received from the plaintiff, and applied to the uses and purposes of said company.

It is also alleged that before bringing suit plaintiff frequently requested the defendant to deliver to him the shares of stock so as aforesaid promised, but that the defendant failed and refused to deliver said stock, or any part thereof, to his great damage, etc.

The prayer of the complaint is (1) that the defendant be decreed to assign and deliver to the plaintiff shares of the capital stock of said defendant company equal in value to the sum of $1,666.66; (2) that the defendant be decreed to account with plaintiff for any and all divi-

dends due on the shares of the capital stock of said company, equal in value to the sum of $1,666.66, since the said 1st day of February, A. D. 1884, and to pay the same to plaintiff; (3) that the defendant be decreed to pay to the plaintiff the sum of $1,666.66, together with legal interest thereon from the 1st day of February, A. D. 1884, and damages for detaining the same; (4) that the plaintiff have his costs of his suit, and such other and further relief as the court may decree just and equitable.

To this complaint the defendant answered, specifically denying each and every allegation thereof except the first. Upon these pleadings the cause was tried to the court, without the intervention of a jury. Upon such trial the issues were found for the plaintiff, and judgment in his favor accordingly entered for the sum of $2,066.66. To reverse this judgment the case is brought here by appeal.

Mr. L. P. MARSH, for appellant.

Mr. T. D. W. YONLEY, for appellee.

MR. JUSTICE HAYT delivered the opinion of the court.

The points relied upon by appellants for a reversal of the judgment may be briefly stated as follows: (1) Insufficiency of the evidence to establish the alleged agreement. (2) Failure of the proof to show the performance by plaintiff of the conditions imposed upon him by the terms of the alleged agreement. (3) That said agreement is *ultra vires*, and cannot be enforced against the company if proven.

The uncontroverted evidence discloses that the defendant company was organized by E. F. Lamb, A. V. Scherrer and J. Jay Joslin, on or about the 2d day of January, 1884, with a capital stock of $300,000. The purposes of the organization were set forth in the articles

of incorporation as follows: "Buying and selling of cattle, sheep, horses and mules, and the breeding of the same; also buying and selling lands; also all other business incidental to stock-raising; also buying and selling of real estate in the territories of Wyoming and New Mexico, and in the state of Colorado." And by said articles of incorporation it was further provided that the management of the corporate business should be by a board of three trustees, and that the aforementioned corporators should constitute such board for the first year. At a meeting of the board of trustees, held upon the same day, the offices of president, general manager, secretary and treasurer were created and filled by the election of A. V. Scherrer, as both president and general manager; E. F. Lamb, secretary; and J. Jay Joslin, treasurer. Although but a small portion of the capital stock of the company had been subscribed for at this time, and the company had but little, if any, money in its treasury, by resolution the president and secretary were duly authorized to purchase for the company from Henry Gebhardt certain ranches, together with a large stock of horses and cattle, and to pay therefor a sum not to exceed $250,000. How this money was to be raised is not disclosed. The purchase was, however, made in accordance with said resolution, $250,000 being the consideration agreed upon. When all this money was to become due by the terms of the contract does not appear. It is sufficient, however, for the purposes of this case, to say that the company became obligated to pay Mr. Gebhardt $48,000 upon said purchase on or before the 29th day of February, 1884.

If it was anticipated that this amount could be realized before that date from the sale of certificates of stock in the corporation, it soon became evident that such anticipation would not be realized; and, as the time approached for making the payment, the officers of the company evidently became much alarmed for fear that the com-

pany would make default. About the time this payment
fell due an arrangement was effected whereby Mr. Geb-
hardt agreed to receive Mr. Joslin's individual note for
$5,000, and $10,000 of the capital stock of the company,
in lieu of an equal amount of cash. These items, with
$18,000 in cash in the treasury, made a total of $33,000
available in discharge of the payment of $48,000, leaving
a balance of $15,000 to be provided for. In this emer-
gency, the plaintiff, who had become familiar with the
company's affairs, having acted as its attorney in some
matters, was applied to for assistance in securing this
balance. The negotiations on the part of the company
were conducted by Mr. Scherrer, Dr. Smythe and Mr.
Lamb, acting together, the former being president and
general manager at the time, and the latter its secretary,
while Dr. Smythe, who was a stockholder in the com-
pany, had in some way also become a trustee.

In reference to the negotiations Dr. Smythe says: "The
substance of the proposition to Mr. Stevens was like
this: that, if he could procure for the company $15,000,
the company would give him $5,000 in stock, or, for a
less amount, a proportionate amount of stock." And in
this statement the witness is corroborated, not only by
the plaintiff and Mr. Lamb, but also, in the main, by Mr.
Scherrer; although the latter states that he and Mr. Lamb
were to furnish the stock, and not the company.

Under this evidence, the trial court could not have
done otherwise than find that the officers of the company
were acting for and on behalf of the corporation in these
negotiations, and that Mr. Stevens was promised remu-
neration for his services in the capital stock of the com-
pany, as testified by Dr. Smythe. Whether or not such
officers had authority from the corporation to so agree
we will consider later.

Stevens, having consented to undertake to raise the
money for the company upon the terms proposed, opened
negotiations for the same with the Union Bank of Den-

ver, but soon reported to the officers of the company that he could secure only $5,000 of the amount; and this seems to have been all that was needed, as the company succeeded about this time in procuring $10,000 from other sources.

The $5,000 which plaintiff says he was instrumental in procuring for the company, and for which he claims a commission in stock, under the contract, was procured from said Union Bank. In reference to this loan, Stevens, in substance, testifies that he went to this banking house upon the next morning after the company had enlisted his services in the matter, and saw Mr. Todd, the cashier, in reference to the loan, and told him that the defendant desired to borrow $15,000. That Todd stated that a similar application had been made to him, and he could not loan that amount. "I then talked with Mr. Todd with reference to the loan; told him all that I knew about the financial standing of the company, the lands it had and the number of cattle, and the mortgages that were on both the land and the cattle; and also told him in the very first conversation that my impression was that the individuals — the trustees — would sign the note. Mr. Todd told me in that conversation if the Arapahoe Cattle & Land Company, and also Mr. Scherrer and Mr. Joslin and Mr. Lamb, would sign a note, he would loan them $5,000; and in the same conversation he also said that he would like to have the stock of the company which was unissued remain in bank; also that he should know what stock was issued during the time of this loan. I immediately went to the office of the Arapahoe Cattle & Land Company, and saw Mr. Lamb, the secretary, at that time. I told Mr. Lamb the conversation I had with Mr. Scherrer the night before — the entire conversation. I told him Mr. Todd would loan $5,000 to the company, provided they signed the note individually, and provided the stock was left in the bank. Mr. Scherrer was also in the office; that is my recollection. He then went and consulted

with Mr. Scherrer, and came and said, 'That is all right; you go over to the bank and get the note.' Mr. Todd filled out the note, and I took it to Mr. Lamb, and it was executed, and Mr. Lamb and I went over to the bank, and a certificate was obtained. * * *" It also appears that said certificate of deposit was accepted by the defendant, and the money obtained thereon by it. Under these circumstances, we think the trial court was justified in finding that the plaintiff had performed his part of the agreement.

Having determined that the officers of the corporation, acting for and in behalf of the company, did make the agreement with Mr. Stevens as alleged, and that Stevens performed the conditions imposed upon him by said agreement, to the extent of securing $5,000 for the company, the liability of the company upon the contract becomes fixed, provided the corporation might lawfully make such a contract, unless its officers, in making the same, were acting beyond the scope of their authority.

As we have already seen, the corporation was organized for the purpose of buying and selling lands, horses, cattle, etc., "also all other business incidental to stock-raising." Scherrer and Lamb were general officers of the company, and must be presumed to have the powers usually conferred upon such officers. In addition to this they were duly empowered to purchase the Gebhardt stock, etc., and this authority must be held to be as broad as the transaction. The power to purchase necessarily carried with it the power to obligate the company to pay, notwithstanding the fact that a by-law of the company forbade the contracting of any debt for the company except by order of the board of directors. Plaintiff was not a member of the company, and his rights cannot be affected by a by-law restricting the general powers of the officers of the company, of the existence of which by-law he is not shown to have had notice. Mor. Priv. Corp. § 500; Ang. & A. Corp. 370, note *a;*

*Flint v. Pierce,* 99 Mass. 68–70; *Royal Bank of India's Case,* L. R. 4 Ch. 252; *Maher v. City of Chicago,* 38 Ill. 266.

It is said that the contract with Stevens was fraudulent, and for this reason cannot be enforced. No question of fraud, however, is raised by the pleadings. Fraud must be alleged before it can be proven, and in this case neither was attempted.

It is not necessary that shares in a corporation be paid for in cash. It has been held that the managing officers of a corporation may, in their discretion, issue full paid-up shares for real estate, labor and materials useful in carrying on the corporate business. In fact, such payment may usually be made in money or its equivalent, and if in the latter, the transaction cannot be impeached for error of judgment on the part of the officers of the company as to the value of the services or property. Good faith and the exercise of an honest judgment meet the requirements of the law. Mor. Priv. Corp. §§ 426, 429; *Schenck v. Andrews,* 57 N. Y. 133; *Douglass v. Ireland,* 73 N. Y. 100; *Iron Co. v. Drexel,* 90 N. Y. 87; *Lorillard v. Clyde,* 86 N. Y. 384.

The above cases were all decided under the provisions of the act of 1853 of the state of New York, which act was amendatory to the provisions of a previous law of the state requiring that nothing but money should be received as payment for the stock of incorporated companies. By the amendment the trustees of such companies were authorized to purchase any property necessary for the corporate business, and in payment therefor to issue stock "to the amount and value thereof." Under this act it may now be considered as the settled doctrine in that state that the trustees, in taking property, must exercise their discretion, and that their judgment as to the value of the property, and the necessity for it, will not be interfered with, in the absence of fraud. Thus it is said in *Schenck v. Andrews, supra:* "They were the

agents on behalf of the company, for that purpose, and the discharge of their duty called for the exercise of their discretion and judgment (having reference and due regard to the interests of those represented by them) in determining what should be bought, and the price to be paid therefor. It cannot be properly claimed, in giving a construction to the power conferred on them by the amendatory act, that the property purchased, and every part thereof, should be indispensable for the prosecution of the business of the company, or that the sum allowed therefor should be its precise, actual, intrinsic value (and that to be determined by the verdict of a jury), for the exemption of a stockholder from the liability which the original act imposed, in case the whole capital was not actually paid in cash. Such a construction would defeat the evident object of the law, which clearly was to encourage the formation of companies, by the appropriation of manufactories, mines and other property, proper for their business, and at a fair valuation, instead of money as a capital therefor. No person could be expected to become a stockholder and pay his money or appropriate his property, and he, nevertheless, be held liable to a contribution in favor of creditors, to the extent of the stock issued for such property, if a jury should subsequently, and at an indefinite and unlimited period thereafter, find that the trustees had, under a mistake, but in an honest exercise of their judgment, concluded erroneously, either that the property was in fact, as disclosed by subsequent events, not absolutely indispensable, or actually worth the full sum allowed for it."

From all that appears in this case, the directors, in making the agreement with Stevens, were acting in good faith for the company, doing what they considered at the time was advisable in order to provide the necessary funds to meet the payment then due upon the Gebhardt purchase, to make which purchase, it would seem, was the primary object of the incorporators in organizing the

company. And although the result shows that the price agreed to be paid Stevens for his services was extravagant, this of itself furnishes no ground for releasing the company from its contract. In the absence of fraud, accident or mistake, courts cannot relieve parties from the hardships of a contract which they have freely and voluntarily made. By the terms of this contract Stevens was to receive $1,666.66 in the capital stock of the company for his services. We think the company might lawfully have agreed to pay him a similar amount in cash for his services, and we know of no reason why the contract to pay for such services in the capital stock of the company should not be enforced; particularly as no claim is made that any other creditor would be in the least prejudiced thereby.

We do not understand that any complaint is made as to the amount of the judgment, provided it be determined that Stevens can recover upon the express contract. Between the time at which plaintiff became entitled to this stock, under the terms of the contract, and the time of trial, two dividends had been declared upon this stock, of twelve per cent. each, and the amount of such dividends, added to the market value of the stock, give the amount of the judgment. The judgment is affirmed.

*Affirmed.*