# EVERS *v.* WATSON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF MISSISSIPPI.

No. 180. Submitted January 25, 1895. — Decided March 4, 1895.

When it is not shown when, or at whose instance, or upon what ground a removal of a cause from a state court was effected, and no copy of the petition or of the substance of it is in the bill or annexed to it, everything must be presumed against the party objecting to it.

As, under the act of March 3, 1875, c. 137, it was in the power of the court to rearrange the parties and to place them on different sides according to the actual facts, it is to be assumed that that power was exercised by the court below, and its action in that respect is not reviewable here.

After a final decree in a case, an apparent want of jurisdiction on the face of the record cannot be availed of in a collateral proceeding.

The charges of fraud in this case are too vague to be made the basis of a bill to set aside a judicial sale.

The delay of the plaintiffs for four years to assert their claim is, under the circumstances, fatal to it.

THIS was a bill in equity to set aside a decree rendered in a former case of *Watson* v. *Evers et al.*, for want of jurisdiction, or that the sale of certain land by a special commissioner, under such decree, be set aside as to all the lands still in the possession of the defendants.

Plaintiffs, who were aliens, British subjects and residents of London, set forth that in 1881 or 1882 they, together with Watson and one Baldwin, citizens of Illinois, were associated together in the purchase of a large quantity of land in Mississippi, known as the Delta, amounting to 500,000 or 600,000 acres together with certain pine lands amounting to about 150,000 acres. That certain differences having arisen as to their respective interests, Watson filed a bill in the chancery court of Le Flore County (a mistake for De Soto County) against Evers, William Marshall, George F. Philips, M. S. Baldwin *et al.*, which was removed into the Circuit Court of the United States, wherein a decree was rendered on October 3, 1885, in

favor of Watson for the sum of $145,000, which was charged as a lien upon said lands, and, in the event of the failure of the defendants to pay such sum within six months from the date of the decree, the lands were to be sold by one McKee, as special commissioner, for the satisfaction of the decree. The land was accordingly sold, and most of it bought in by Watson, such sale being afterwards confirmed by the court. " That said decree was a consent decree, agreed to in a spirit of compromise, and accompanied with and based upon certain agreements to be hereinafter explained."

The bill further alleged that the Circuit Court of the United States was without jurisdiction to entertain such suit, or render such decree, by reason of the fact that Watson, the plaintiff in such bill, was a citizen of Illinois, and Baldwin, one of the defendants, and a material defendant, was likewise a citizen of Illinois.

It was further charged that before the sale of the land was had, Watson and his agents and representatives conspired with one Burroughs to prevent them (the plaintiffs) from being present at said sale, and to deter them from bidding for the lands, the result of which fraudulent collusion was that Watson bought the lands at a mere trifle per acre, except about 162,000 acres, which it was fraudulently agreed that Burroughs and his friends should buy at their own figures. That but for such fraudulent collusion the Delta lands would have sold for more than enough to satisfy the decree, and would have left, at least, the pine lands to plaintiffs in this bill and the other defendants in said suit, after fully paying their debt. Instead of this, that they succeeded in securing all the land, and still claimed a large balance against the defendants in that suit as due by the decree; more, in fact, than Watson originally advanced for the purchase of the land. That the plaintiffs were not aware of and had no knowledge of the fraud practised upon them by Watson until recently, and long after the sale had been ratified and confirmed, and that this was the first opportunity to bring the matter before the court, and they ask a restitution of their rights and an equitable redress for the fraud.

That the decree was a compromise decree, accompanied by stipulations, one of which was that the defendants were to have six months in which to pay the decree, and that, when they acquiesced and consented to such decree, it was their intention and expectation, and it was so understood by all parties, to organize a land company in London, and to sell the lands referred to in the decree for money enough to pay off said indebtedness, and the balance in stock and debentures and working capital, within the six months allowed to them by the decree. That to accomplish this, and carry out the understanding, a company was organized, at great expense to plaintiffs, and a satisfactory sale of the lands arranged to be made to such company, which would have been perfected, and Watson's debt paid, but for the interference of Watson and his agents, who, by circulating false reports affecting the title to the land, prevented such company from being floated, and defeated the efforts of the defendants in such suit, in raising money to comply with their agreement to pay off such decree. That afterwards, a son of Watson, representing his father and the Delta and Pine Land Company, visited London, and, recognizing the fact that plaintiffs still had an interest in the lands, agreed to organize another English company, certain shares of stock in which company they agreed to receive. That plaintiffs, being ignorant of the fraud that had been practised upon them at the time of the sale, and relying upon the statements of Watson's son, at his request executed quitclaim deeds of their interests in such lands, Watson stating that he wanted such deeds in trust solely for the purpose of facilitating the sale of the lands to such company, and promising that such deeds when executed should be deposited by him with Walter Webb & Company, of Queen Victoria Street, London, the solicitors of such company. That Watson, instead of depositing the deeds with the solicitors, fraudulently and in violation of his promise and agreement, sent the deeds to Mississippi, and caused them to be registered in the several counties in which the lands were located. That this was done without the knowledge or consent of plaintiffs; that the organization of the company was

never perfected, and negotiations for the sale of the lands had been abandoned. No stock was ever issued, plaintiffs never received any consideration for the deeds, or their interest in the lands. Such deeds were obtained by fraud and false pretences and promises made by Watson, were without consideration, and are void. That plaintiffs are informed that Watson and the persons associated with him in the Delta and Pine Land Company have sold a large quantity of the lands at a good price, as well as a large amount of timber from the lands remaining in their possession, and have realized from such sales, more than enough to pay the decree and the interest thereon.

The prayer of the bill was that the court set aside the decree rendered in the case of *Watson* v. *Evers* for lack of jurisdiction, or, if mistaken as to this, that the sale by the commissioner be set aside as to all the lands still in possession of defendants; that the quitclaim deeds be held to be inoperative and void, and defendants be required to render an account of the lands and timber sold by them, and the amount of taxes paid on the land since such sale. That the sums received, after paying the taxes, be credited upon the decree, and, in case Watson proves to have been overpaid, that a decree be awarded in favor of plaintiffs for the excess, and that the land now in possession of defendants be decreed to be the property of the plaintiffs, as their interest may appear.

A demurrer was filed to this bill by Watson and the Delta and Pine Land Company, which was sustained by the court, and the bill dismissed.

From this decree plaintiffs appealed to this court.

*Mr. James L. McCaskill* for appellants.

*Mr. Frank Johnston* and *Mr. J. Hubley Ashton* for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

To maintain this bill, plaintiffs take the position either that the Circuit Court for the Northern District of Mississippi, to

which the case was removed, was wholly wanting in jurisdiction to render the decree complained of in the case of *Watson* v. *Evers et al.*, or that the sale made in pursuance of such decree was not only voidable for fraud, but absolutely void and subject to collateral attack in this proceeding.

1. The allegations of the bill with regard to the want of jurisdiction of the Federal court are very meagre, and are simply that Watson filed a bill in the state court against Evers, Marshall, Philips, and Baldwin, which suit was removed to the Federal court and a decree rendered therein. That such court was wholly without jurisdiction since Watson, as shown in the bill, was a citizen of Illinois, and Baldwin, one of the defendants, was also a citizen of the same State. It is not shown when, or at whose instance, or upon what grounds the removal was effected, nor is there a copy of the petition or the substance of it, either incorporated in the bill or annexed thereto as an exhibit. We are left wholly in the dark as to these important particulars, and, under these circumstances, everything must be presumed against the pleader. We are bound only to inquire whether a suit to which two citizens of the same State were originally plaintiff and defendant could possibly have been removed to the Federal court. The presumption is that the court did have jurisdiction, and that its decree is valid, and, assuming for the present that the court may attack it collaterally, the burden is clearly upon the plaintiffs in this case to show that the decree was void.

We are not even informed by the amended bill of the year in which the bill was filed in the state court or the removal had; but, as it is averred that the parties to such suit were associated together in 1881 or 1882, and the decree was rendered in 1885, we are left to infer that the removal must have taken place under the act of March 3, 1875, c. 137, 18 Stat. 470, which, at that time, determined the jurisdiction of the Federal courts. By section 2 of that act, " any suit of a civil nature, at law or in equity, now pending, or hereafter brought, in any state court where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, . . .

in which there shall be . . . a controversy between citizens of a State and foreign States, citizens or subjects, either party may remove said suit into the Circuit Court of the United States for the proper district, and when in any suit mentioned in this section there shall be a controversy which is wholly between citizens of different States, and which can be fully determined as between them, then either one or more of the plaintiffs or defendants actually interested in such controversy may remove said suit into the Circuit Court of the United States for the proper district."

The position of Baldwin as defendant in the case was not conclusive as to his actual interest in the litigation. For aught that appears, his interests may have been identical with those of Watson, and adverse only to his alien codefendants. In such case, it would have been perfectly competent for the court to ascertain the real matter in controversy, and to have rearranged the parties to the suit upon the opposite sides of such controversy, and thus sustain the jurisdiction of the court. The power of the court under the act of 1875, thus to rearrange the parties, and to place them on different sides of the matter in dispute according to the actual facts, has been recognized by this court in several cases. *The Removal Cases*, 100 U. S. 457; *Pacific Railroad* v. *Ketchum*, 101 U. S. 289; *Harter* v. *Kernochan*, 103 U. S. 562. If such were the case here, the suit would then stand as one, wherein two citizens of the same State were plaintiffs, and aliens were defendants, which would be removable, irrespective of the question, whether, under the second clause of the section, a separate controversy between citizens and aliens could be removed. It would appear from the opinion of the District Judge that this was the view taken by him. Even if he had been mistaken as to the actual community of interest between Watson and Baldwin, as matter of fact his decision in respect thereto would not be reviewable collaterally. *Grignon's Lessee* v. *Astor*, 2 How. 319; *Michaels* v. *Post*, 21 Wall. 398; *Chapman* v. *Brewer*, 114 U. S. 158, 169; *Noble* v. *Union River Logging Railroad*, 147 U. S. 165. Even upon the theory of the plaintiffs, to authorize the court to hold the decree in that case void

in a collateral proceeding, it was necessary to show beyond any controversy that, upon the record, the court could not have had jurisdiction. This the pleader has failed to do.

But we do not wish to be understood as holding that, even if jurisdiction had not been apparent upon the record, advantage could be taken of it after a final decree, and in a collateral proceeding. Thus in *Skillern's Executors* v. *May's Executors*, 6 Cranch, 267, a case which had been reversed by this court and sent back to the Circuit Court, was discovered to be one not within the jurisdiction of that court. But as it appeared that the merits had been finally decided in this court and its mandate required only the execution of the decree, it was held that the Circuit Court was bound to carry the decree into execution, although the jurisdiction of that court was not alleged in the pleadings. So in *McCormick* v. *Sullivant*, 10 Wheat. 192, a prior judgment between privies in estate was pleaded in bar of the remedy sought to be enforced in the suit then under consideration, and objection was made that the proceedings did not show that the parties to it were citizens of different States, and, consequently, that the court was without jurisdiction and the decree void. It was held, however, that the courts of the United States, though of limited, were not of inferior jurisdiction, and that, if jurisdiction were not alleged in the pleadings, their judgments and decrees were erroneous, and might be reversed for that cause; but that they were not absolute nullities, and that the decree in the former case, while it remained unreversed, was a valid bar to the suit under consideration. To the same effect are *Ex parte Watkins*, 3 Pet. 193; *Kennedy* v. *Georgia State Bank*, 8 How. 586; *Des Moines Navigation Co.* v. *Iowa Homestead Co.*, 123 U. S. 552, and the recent case of *Dowell* v. *Applegate*, 152 U. S. 327.

These authorities are especially pertinent to this case, in view of the fact that, after the removal of the case to the Federal court, the parties thereto, including the plaintiffs herein, acquiesced in its jurisdiction, and entered into a consent decree, which was designed to settle the entire controversy.

2. It is also evident that the charges of fraud are altogether too vague to be made the basis of a bill to set aside the sale.

The Delta and Pine Land Company is made a defendant to the bill, but for what reason does not clearly appear. It is only averred that Watson's son, representing his father and the Delta and Pine Land Company, visited London and agreed to organize another English company, and that plaintiffs should have certain shares of stock in that company; and that said Watson and the other persons associated with him in the Delta and Pine Land Company have sold a large quantity of such lands at a good price, and that they have also sold a good deal of timber off the lands remaining in their possession, and have realized more than enough to pay the sum due upon the decree. But there is no averment to whom the quitclaim deeds in London were executed, or what the interest of the Delta and Pine Land Company was in the lands, or how it became possessed of such interest, though, from the fact that plaintiffs call upon the company to account for the money received from the sale of such lands, it would appear that in some way it became the purchaser of a portion of such lands. There is no averment, however, of such purchase, or, if it were made, that the company purchased with the knowledge of the fraud alleged.

There is a general allegation that Watson and his agents conspired fraudulently with one Burroughs and others to prevent plaintiffs from being present at the sale, and to deter them from bidding; but it is not averred by what representations or other fraudulent means, contemplated bidders were prevented from attending an official sale, which the law required to be advertised for a certain number of weeks; and it is highly improbable that if plaintiffs had designed to buy in this land they would have omitted to attend the sale and permit Watson to buy them at a mere trifle per acre. A fraudulent agreement is also averred that Burroughs and his friends should buy about 162,000 acres, but the particulars of the alleged arrangement are entirely wanting. There is also an averment of fraudulent collusion of Watson and his representatives preventing all competition, and that, had it not been for such collusion, the Delta lands alone would have sold for more than enough to pay off the decree, and would

have left the pine lands to the plaintiffs and the other defendants in such suit after fully paying their debt. There is no averment, however, of the means used to prevent competition, and the whole allegation is vague and unsatisfactory. There is also an averment that the complainants were not aware of and had no knowledge of the fraud practised upon them by Watson until recently, and long after such sale had been ratified and confirmed. But it appears that such sale occurred in 1886, was a matter of public record, and yet was allowed to rest until 1890 without action or challenge, when this bill was filed.

It further appears that one of the stipulations, under which the consent decree was entered, was that defendants were to have six months in which to pay and satisfy the decree, and that it was their intention to organize a land company in the city of London, and to sell the lands referred to, and pay off the indebtedness; but that this scheme was also thwarted by the interference of Watson and his agents, who, by circulating false reports affecting the title of the lands, prevented the company from being floated. But the bill does not allege what these false reports were, or to whom they were made, or any facts from which the court can determine whether they were likely to affect the organization of the company or not. It does not appear when Watson's son visited London, or what means were used to induce plaintiffs to execute quit-claim deeds of their interests, or when such deeds were executed, or to whom they were executed. There is no reason given why plaintiffs did not, in view of all these alleged frauds, apply to the court which ordered the sale for an order vacating the same. If the transactions took place as stated by them, they could hardly have been ignorant of the fraud practised upon them. As the sale and the prices paid were matters of record, plaintiffs were bound to inform themselves of the facts, and to take steps to protect their interests. *Foster* v. *Mansfield, Coldwater &c. Railroad*, 146 U. S. 88. It does not even appear whether the transaction in London occurred before or after the sale, though the inference is that it was some time after, when the plaintiffs must have been

aware of the suspicious circumstances attending the sale, or at least should have made inquiries. In short, the bill is much more remarkable for what it omits, than for what it alleges.

It does appear, however, that Watson had a claim against these parties, which was settled by the consent decree at $145,000; that 162,000 acres of these lands were purchased by Burroughs, who is not made a party to this suit, although he is alleged to have fraudulently conspired with Watson; and a large portion of these lands have been sold, presumptively, to *bona fide* purchasers, and that, in the lapse of time that has intervened, it would be impossible to restore the parties to their original positions.

It is apparent that the whole case depends upon the validity of the sale made by the special commissioner. If this sale were valid, plaintiffs lost all their interests in the lands, they had nothing left to convey by their subsequent quitclaim deeds, and the cancellation of such deeds would not revest them with any interest. If the sale were voidable, either by reason of a fraudulent combination to deter the plaintiffs from being present, or to prevent competition, or by reason of the false reports circulated in London, to prevent the plaintiffs from carrying out their agreement to satisfy the decree within six months, it was the duty of the plaintiffs, instead of executing quitclaim deeds, and thus putting themselves again into the hands of parties whom they allege to have twice played them false, to promptly disaffirm their acts, and seek to repossess themselves of the property. Their delay of four years, during which much of the property has been sold, presumptively to parties who have purchased without notice, is fatal to their claim.

The decree of the court below sustaining the demurrer and dismissing the bill was correct, and it is, therefore,

*Affirmed.*