CALIVADA COLONIZATION CO. v. HAYS.

(Circuit Court, W. D. Pennsylvania. December 3, 1902.)

No. 6.

1. EQUITY PLEADING—ANSWER AS EVIDENCE.

Unless answer under oath is expressly waived in the bill, such answer, if responsive, is evidence on behalf of the defendant, and to overcome it complainant must have at least one sustaining witness and corroborative circumstances.

2. EVIDENCE—TESTIMONY OF PARTY CALLED BY ADVERSARY.

The Pennsylvania act, permitting a party to be called and examined "as on cross-examination," has no application in a suit in equity in a federal court, and a party so called and examined therein becomes a witness for the party calling him, and his testimony is to be given weight accordingly.

3. CORPORATIONS—VALIDITY OF STOCK—ISSUANCE IN PAYMENT FOR SERVICES.

Complainant corporation by resolution of its board of directors, passed shortly after its organization, issued over one-half of its stock to defendant, who was its president, in consideration of services rendered by him in obtaining contracts and options on property, all of which were turned over to the corporation, and through them the company obtained all lands which were the basis of its operations. The transaction was fully shown on the books of the company, and was approved by all its then stockholders. There was also an understanding that defendant should use a portion of such stock for the purpose of interesting other persons in the company, which he did, retaining for himself but a comparatively small portion. *Held* that, in the absence of proof of an actual fraudulent intention, such stock was not illegal, and subject to cancellation at the suit of persons who subsequently became stockholders with full opportunity to know the facts, either under the general rules of law or under the laws of Colorado, where the corporation was organized,

which permit the issuance of stock for labor done or services performed or property actually received.

4. EQUITY—LACHES—PLEADING.

Laches need not be pleaded as a defense, but it is sufficient to defeat relief in a court of equity if it appears from the evidence.

5. CORPORATIONS—SUIT TO CANCEL STOCK—LACHES.

A suit by a corporation or stockholders for the cancellation of stock of the corporation on the ground that its issuance was unauthorized and illegal cannot be maintained after the lapse of six years from the time it was issued, during all of which time the transaction appeared fully from the books of the corporation.

In Equity. Sur pleadings and proofs upon final hearing.

James H. McCreery, for complainant.
Frank W. Smith, for defendant.

ACHESON, Circuit Judge. The complainant is the Calivada Colonization Company, a corporation of the state of Colorado, and the defendant is Milton D. Hays, a citizen of the state of Pennsylvania. The bill was filed on July 13, 1901, by A. C. Hays, as receiver of the complainant company, and in its name. He was appointed such receiver by an order of this court made on December 30, 1900, on a bill filed at No. 17, May term, 1900. The heading of the bill in this case, after naming the complainant and defendant in the usual form, proceeds thus: "With notice to Elmer E. Stewart" and 52 other named persons or corporations, who (the bill shows) respectively hold shares of the issue of stock which the bill impeaches and seeks to avoid. There is on file a paper which purports to be an acknowledgment by 17 of these persons of notice of the suit, and an affidavit of service of such notice on 10 others of the named persons. None of the 53 named persons or corporations, however, is a party to the suit. The case was set down by the parties for final hearing, and was so heard, upon the pleadings, namely, the bill, the answer of Milton D. Hays, and replication, and the proofs.

The bill sets forth that the Calivada Colonization Company is a corporation of the state of Colorado, and was incorporated on the 11th day of March, 1895, by letters patent, its authorized capital stock being $250,000, consisting of 250,000 shares, each of the par value of $1; that in said letters patent M. D. Hays, C. C. Marble, Frank Goodnow, and A. C. Hays were named as directors of said company; that on the 13th day of March, 1895, three of these named persons, to wit, M. D. Hays, C. C. Marble, and A. C. Hays, held the first meeting of the board of directors, the minutes of the meeting showing that M. D. Hays was president, C. C. Marble secretary, and A. B. Grindall treasurer; and that the said board of directors at that meeting adopted the following resolution:

"Resolved, that the board of directors of the Calivada Colonization Company, in consideration of the services, efforts, and information acquired and money expended by M. D. Hays in behalf of the company, hereby directs the issue to him of 126,000 shares of the capital stock at the par value of one dollar each in compensation therefor."

¶ 4. See Equity, vol. 19, Cent. Dig. §§ 395, 648.

The bill avers that at the time of said meeting the persons who acted as directors were not stockholders in said company, and therefore were not qualified for the office of director, and acted in violation of section 481 of the Annotated Statutes of Colorado; that at the time of the passage of said resolution the said M. D. Hays gave no consideration therefor to said company; that the purpose of the resolution was to secure to him the control and perpetual management of the company; and that soon thereafter all moneys expended by him in behalf of the company were repaid to him by the company. The bill, inter alia, avers that the defendant, Milton D. Hays, while president of the complainant company, on June 9, 1896, submitted to certain named persons now stockholders of the company a statement signed by F. R. Myers, then secretary of the company, setting forth the liabilities of the company, and that upon the presentation of this statement, or soon thereafter, the defendant, acting as president of the company, sold to these persons 40,000 shares of the company's stock; that the persons who subscribed for said 40,000 shares of stock "were not advised at the time of said subscription that the controlling interest had been fraudulently and without consideration given to the defendant"; and that the defendant "unlawfully, and with intent to commit a fraud, withheld such knowledge from the said subscribers, and in violation of his obligation to such corporation misled and deceived the said subscribers, and unlawfully secured from them their subscription and their money." The bill further avers that the "defendant never conveyed any real estate, or any option for the purchase of real estate, or gave any other lawful consideration, for the said stock issue made under the resolution of March 13, 1895"; and that "the adoption of the said resolution and the issue of said stock was a fraud on the said company, and upon all the bona fide holders and purchasers of the stock of said company, who subsequently became holders and purchasers of stock without knowledge thereof," and also in violation of the constitution and laws of the state of Colorado. The bill avers that soon after the passage of the resolution of March 13, 1895, the defendant, as president of the company, "caused a credit to be entered in the stock books of the company in his name for 126,000 shares of stock, and furthermore caused an issue to the said defendant, Hays, of certificates thereof signed by him as president, and, as shown by the record of the said company, had from time to time transferred portions of the same to persons named herein as owners thereof," and that these transferees claim and exercise control of said stock. The bill then proceeds to set forth the names of "the present holders of said stock, with the number of shares held by each, as shown by the records of said company"; and after thus naming 53 present holders of this issue of stock, with the number of shares held by each, the list concludes thus: "And M. D. Hays, 18,218." The bill avers that the present holders of "said unlawfully issued stock received the same as gifts from the said M. D. Hays," and "charged with notice of the want of consideration and unlawful issue thereof." The bill states that "this bill of complaint is filed on the written request of a majority of the board of directors of the said company, and by par-

ties owning and holding the majority of the properly issued stock of this company." The main prayers of the bill are that the court "decree that each and every share of said stock, aggregating 126,000 shares, be declared null and void, issued without consideration, in violation of law, and in fraud of the said corporation, and the rights of the bona fide owners and purchasers of the stock of said company," and that the court decree "that said stock be canceled," and the "company be reinstated in the ownership of the said 126,000 shares of s+ock."

The answer of Milton D. Hays, the defendant (which is under oath), responsively and fully denies all and singular the allegations of the bill upon which the supposed right of the complainant to relief rests. Specifically, the answer traverses and denies each and every averment of the bill, charging fraudulent or unlawful intent, purpose, or act in the adoption by the board of directors of the resolution of March 13, 1895, or in the issue of the stock thereby authorized, and the allegation of the want of consideration for the same, and denies that all moneys expended by the defendant in behalf of the company were repaid to him. In respect to the subscription for 40,000 shares of stock, the answer, while admitting that as president of the company, and acting under a resolution of the board of directors, the defendant sold to the named subscribers these 40,000 shares, denies that he misled or deceived them, or withheld from them any information as to the issue of the 126,000 shares to himself, and avers that they were fully advised of the said issue and of the status of affairs, and that they subscribed for and got said stock from the company at the price of only 25 cents per share. Responding to the averment of the bill that the "defendant never conveyed any real estate, or any option for the purchase of real estate, or gave any other lawful consideration for the said stock issued under the resolution of March 13, 1895," the answer states that the scheme of the Calivada Colonization Company originated with the defendant, and that he spent much time and a large amount of money in various states of the West seeking a proper location; that at a great expenditure of time and labor he had procured agreements and options for the purchase of upwards of 100,000 acres of land, and also water rights, in different parts of the West, which agreements and options were valuable, and, if properly handled, capable of yielding large profits; that he turned over to the complainant company all his said agreements and rights, and gave the company the information he had acquired, and in all things put the company in the same position he occupied himself; that the 126,000 shares of stock were issued to the defendant to recompense him for the time and money spent by him in and about the work of the organization of the company and procuring the control of said property; that it was the defendant's services and labor that made the stock of the company of any value whatever; that at the time the resolution of March 13, 1895, was passed by the board of directors, it was agreed to by every person who owned stock in the Calivada Colonization Company, and the stock was issued to the defendant with the knowledge and sanction of all the stockholders; that there was no concealment

about the transaction, but it was open to the knowledge of all stockholders. The answer further states that it was understood that the stock so issued to the defendant was to be used as he might see fit in the promotion of the said company, and in interesting such persons as he thought best in the company, and that accordingly much the greater part of said stock was transferred by the defendant to various persons for services rendered by them in said company or to interest them in its welfare, and that only about 25,000 or 30,000 shares of the stock were retained by the defendant for his own uses and purposes, which amount was a small compensation to the defendant. In respect to the present holders of said issue of stock (other than himself), the defendant in his answer states "that in most instances said stock was transferred to said parties for and in consideration of services rendered by said holders either in the promotion of said company or for services rendered to defendant, and he alleges that he had a perfect right to do with said stock as he pleased; that it was his stock, for which he had given value, and he had full right to transfer it to such person or persons as he saw fit." The answer sets forth that at the annual meeting of the stockholders of the complainant company held on March 17, 1896, as appears from the minute book of the company, the following confirmatory resolution was adopted:

"Moved by F. L. Bonta, the members of this company present ratify all the acts of the former boards of directors during the years of 1895 and up to March 17, 1896, at this meeting of the stockholders. Seconded by F. K. Higbie. Carried."

The complainant not having waived an answer under oath, and the defendant's answer being under oath and responsive to the allegations of the bill, what effect is to be given to it? This question is solved by the ruling in Conley v. Nailor, 118 U. S. 127, 134, 6 Sup. Ct. 1001, 1005, 30 L. Ed. 112, where the supreme court said:

"The answer, though not called for under oath, is evidence in behalf of the defendant; for, if a plaintiff in equity is unwilling that the answer should be evidence against him, he must expressly waive the oath of the defendant in his bill. See amendment to forty-first equity rule. If he fails to do this, the answer must be given under oath and is evidence."

In order to overthrow an answer responsive to the allegations of the bill, it is the universal rule that the complainant must have at least one sustaining witness and corroborative circumstances. Now, the minute book of the complainant company (in evidence) shows that the resolution of the board of directors of March 13, 1895, was spread at large upon the minutes at the date of its adoption, and that the ratifying resolution of the stockholders was entered upon the minutes the day it was passed, March 17, 1896, and the company's stock books (in evidence) show the issue of the stock in question to the defendant,—the great bulk of it on April 23, 1895,—and the various transfers of this stock by him as recited in the bill. If, then, the defendant's case rested simply upon his responsive answer and this documentary evidence, the preponderance of proof, in my judgment, would be with the defendant.

But the state of the proofs is still more favorable to the defense in view of the fact that the complainant called and examined the defendant as a witness in respect to the matters in controversy, and also by stipulation brought into the case and used the testimony of the defendant taken in a previous suit in equity in this court relating to the same matters, in which one Bimber, a stockholder of the Calivada Colonization Company, was plaintiff, and Milton D. Hays was a defendant, and in which suit the latter was called and examined by the plaintiff therein as a witness. The testimony of the defendant fully accords with and supports his answer throughout. It is true that the defendant was called and examined in this case and in the previous suit as if under cross-examination pursuant to the Pennsylvania act; but this makes no difference, as that statute is not applicable to a suit in equity in a court of the United States. Dravo v. Fabel, 132 U. S. 487, 490, 10 Sup. Ct. 170, 171, 33 L. Ed. 421. In that case the supreme court said:

"But that statute has no application to suits in equity in the courts of the United States. The act of congress providing that the practice, pleadings, forms, and modes of proceedings in civil causes in the courts of the United States shall conform, as near as may be, to the practice, pleadings, forms, and modes of proceedings existing at the time in the courts of record of the state expressly excepts equity and admiralty causes. 17 Stat. 197, c. 255, § 5, Rev. St. § 914 [U. S. Comp. St. 1901, p. 684]. So that, when the plaintiffs used the depositions of Dippold and Fabel, taken 'as under cross-examination,' they made those parties their own witnesses. While the plaintiffs were not concluded by their evidence, and might show they were mistaken, it could not be properly contended by the plaintiffs that they were unworthy of credit. The evidence must be given such weight as, under all the circumstances, it is fairly entitled to receive."

Applying the rules thus laid down to the present case, the fair conclusion, I think, is that the defendant's testimony has not been successfully met. It seems to me that his answer and testimony in all material respects stand unshaken. At the organization of the company he turned over to it all his agreements and options for lands, which were numerous. Many of these the company saw fit to let die. The company, however, acquired through the defendant all the lands, including the Pahrump ranch, with which it has conducted its operations. Whether or not the defendant at the date of the transaction held living written options for these lands we need not stop to inquire. The company got these lands, and got them through the defendant, and not otherwise. This is the important fact. The title, indeed, was made directly to the company, but this is not material. The result was the same, whether the legal title came to the company through the defendant as a conduit or directly from the former owners. Upon the proofs I am not persuaded that the issue of stock under the resolution of March 13, 1895, was an extravagant and unreasonable compensation to the defendant, especially in view of the understanding as to the use the defendant in his discretion was to make of the stock in promoting the interests of the company,—an understanding which the defendant seems to have faithfully carried out, reserving to his personal use a comparatively small portion of the stock. The transaction was not concealed, but was disclosed by the minute book and stock books of the company. It

had the sanction of every one then owning stock. It was open to every subsequent subscriber for, or purchaser of, stock.

Under the constitution of the state of Colorado, art. 15, § 9, and the general laws of the state, a corporation may issue stock for "labor done," or "services performed," or "property actually received." In Land Co. v. Stevens, 13 Colo. 534, 22 Pac. 823, it was declared that "a corporation may issue shares of its stock in payment for services rendered to it, and, where an agreement so to do is entered into in good faith, the fact that the result shows that the price agreed to be paid is extravagant does not of itself furnish a ground to release the corporation from its contract, particularly where no claim is made that the contract is prejudicial to creditors." There the court sustained an agreement by the corporation to issue 5,000 shares of stock to one who borrowed $15,000 for it. The general rule is that to invalidate an issue of stock because of overvaluation of property received in payment it must not only be shown that there was an overvaluation, but that it was intentional, and consequently fraudulent. 1 Cook, Corp. § 35.

The bill does not allege that the subscribers for the 40,000 shares of stock had no knowledge of the fact of the issue of 126,000 shares to the defendant, but guardedly charges that they "were not advised at the time of said subscription that the controlling interest had been fraudulently and without consideration given to the defendant," etc. The defendant testifies that all of them had actual and full knowledge of that issue. There is much in the case to corroborate the defendant in this. Six of those subscribers, whose joint subscription amounted to 26,000 shares, were holders severally of shares of the 126,000 issue of stock, which shares they received from the defendant to interest them in the company, and promote its welfare, and upon no other consideration. If any of the subscribers for the 40,000 shares did not have full knowledge in respect to the issue of the 126,000 shares to the defendant, it was not because anything was concealed from them. They had the means of knowledge within reach; "and the possession of such means of knowledge is, in equity, the same as knowledge itself." City of New Albany v. Burke, 11 Wall. 96, 107, 20 L. Ed. 155. There is no convincing evidence to show that the defendant deceived or misled those subscribers. He made no false representation to any of them. They bought this stock from the company for 25 cents a share, one-fourth of its par value. They bought on speculation, and either knew, or might have known, upon the slightest investigation, of the prior issue of stock to the defendant and all the circumstances.

Even if the resolution of March 13, 1895, and the issue of stock thereunder, had been avoidable originally, the lapse of time before the filing of this bill, on July 13, 1901, should prevent relief. To let in such a defense it is not necessary that a foundation be laid by any averment in the answer. Sullivan v. Railroad Co., 94 U. S. 806, 24 L. Ed. 324. Where the evidence discloses laches on the part of the complainant, a court of equity will refuse relief. Id. Nothing can call a court of equity into activity but conscience, good faith, and reasonable diligence. Hayward v. Bank, 96 U. S. 611, 618, 24 L. Ed. 855. In So-

ciété Fonciere et Agricole des Etats Unis v. Milliken, 135 U. S. 304, 10 Sup. Ct. 823, 34 L. Ed. 208, a delay of only two years in commencing proceedings to set aside a judgment for usury was held to be laches and fatal. In Evers v. Watson, 156 U. S. 527, 15 Sup. Ct. 430, 39 L. Ed. 520, the delay of complainants for four years to assert their claim was accounted good ground for denying relief. In the present case there was a delay of more than six years, which was inexcusable under the circumstances.

By the showing of the bill the defendant holds only 18,218 shares of the issue of stock sought to be avoided, the other 107,782 shares being held by persons who are not parties to the suit. Of course, upon this showing a decree for the cancellation of the whole issue could not be made even if a case for relief as against Milton D. Hays were made out. But, as we have seen, the proofs do not make out a case against him.

I observe, finally, that the creditors of the Calivada Colonization Company have no concern in this controversy. In the first place, without doubt the assets of the company are more than sufficient to pay all its debts; and, secondly, the cancellation of this stock would not increase the assets of the company.

The bill must be dismissed.