Earl **LOESCH** and Henriella Bynon

v.

The **UNITED STATES.**

George R. **WAGNER** et al.

v.

The **UNITED STATES.**

Nicholas and Margaret **PURCELL**

v.

The **UNITED STATES.**

John H. **McGEHEE** et al.

v.

The **UNITED STATES.**

James **CHOUINARD** et al.

v.

The **UNITED STATES.**

Letha M. **TOLLIVER**, Administratrix of Estate of Alfred Tolliver, deceased et al.

v.

The **UNITED STATES.**

Nos. 240–75, 430–75, 435–75, 1–76, 111–76 and 307–77.

United States Court of Claims.

March 11, 1981.

---

Norman E. Hay, Indianapolis, Ind., attorney of record, for plaintiff. Charles S. Gleason, Gleason, Hay & Gleason, Indianapolis, Ind., of counsel.

Hubert M. Crean, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, for defendant. Dorothy R. Burakreis, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and KUNZIG and SMITH, Judges.

## OPINION

PER CURIAM:

These consolidated cases come before the court on plaintiffs' exceptions to the recommended decision (including an opinion, findings of fact, and conclusions of law) filed by Trial Judge Thomas J. Lydon.

The court hereby adopts the trial judge's findings and opinion as the basis for its judgment in the case. The findings, however, are not printed herein since his opinion sets forth the facts necessary for an understanding of the decision.

Therefore, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petitions are hereby dismissed.

## OPINION OF THE TRIAL JUDGE

 LYDON, *Trial Judge*: In these six consolidated cases,[1] owners of land adjacent to and/or on tributaries of the Ohio River,[2] seek to recover just compensation under the fifth amendment, on the theory of inverse condemnations, for damages to their lands resulting, they claim, from governmental actions emanating from the construction and operation of certain high-lift navigation locks and dams on the Ohio River. In substance, plaintiffs' claims are twofold. First, plaintiffs maintain that the construction and operation of the dams in question were such as to cause erosion on their lands thereby, in effect, taking their lands and entitling them to just compensation. Second, plaintiffs contend that defendant, acting through the United States Army, Corps of Engineers (the Corps), in obtaining flowage easements from them in connection with the dam projects in question was guilty of fraud and misrepresentation, particularly in the determination of the ordinary high water mark (OHWM), such that the compensation plaintiffs received for said easements was less than they were entitled to receive for what was actually taken from them.[3] For reasons to be discussed hereinafter, it is my opinion that plaintiffs are not entitled to recover and that their petitions should be dismissed.

## I.

The Ohio River is formed by the junction of the Allegheny and Monongahela Rivers

1. These six cases were tried at a single trial session and, although some of the cases present minor differentiating factors, it is believed that consolidation, at this stage, and disposition of these cases by a single opinion is appropriate under the circumstances. Only the issue of liability is before the court, quantum having been reserved for further proceedings, if necessary.

2. Claims are presented by 23 plaintiffs, husband and wife are treated as one plaintiff, involving 34 separate tracts of land. The claims of one plaintiff (Benner in No. 430–75) were withdrawn at trial and the petition as to these claims dismissed. While all plaintiffs owned the tracts in issue at time of trial, some plaintiffs were not the owners of said tracts at the time some of the operating events in issue took place. The significance of this observation will become apparent later in this opinion. It should be noted that similar claims by 88 additional Ohio River riparian landowners were filed after the trial of these cases (Ct.Cl. No. 161–78; Ct.Cl. No. 340–78; and Ct.Cl. No. 317–79).

3. The ordinary high water mark (OHWM) formed the lower limit of the flowage easements acquired by defendant. The navigational servitude of the government extends to the OHWM. *United States v. Willow River Co.*, 324 U.S. 499, 509, 65 S.Ct. 761, 767, 89 L.Ed. 1101 (1945). The government must only pay for lands taken above the OHWM. *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 627–28, 81 S.Ct. 784, 787, 5 L.Ed.2d 838 (1961); *Barnes v. United States*, 210 Ct.Cl. 467, 475, 538 F.2d 865, 870 (1976). The lower the OHWM, the greater the amount of land deemed taken and the greater the compensation due therefor. Absent other considerations, to the extent that plaintiffs can establish that the OHWM determinations as to each tract in issue are erroneously high, they would be entitled to additional compensation. *See Vanada v. United States*, 202 Ct.Cl. 1121, 1122–23 (1973).

at Pittsburgh, Pennsylvania, and then flows for 981 miles to Cairo, Illinois, where it joins the Mississippi River. It is a navigable river for its entire length, falling 429 feet in its 981-mile course from Pittsburgh to Cairo.

The Ohio River is considered to be a "pleistocene river," *i. e.*, it was formed at or before the glacial period. This period is believed to have begun about a million years ago. While the Ohio River is considered to be basically an alluvial river, *i. e.*, one which erodes, transports and deposits sedimentary materials, its riverbanks at many locations are composed of bedrock, which serves to control not only the position of the channel at those locations but also to control the river's ability to erode at those points. These bedrock sites can contribute to erosion at other riverbank sites by diverting river currents toward such sites. Similarly, river current action serves to explain why riverbank erosion generally occurs on the outside of bends in the river.

The Ohio River, like other rivers, is dynamic. The highly variable flow of an unregulated river exerts considerable erosional forces on a river's bed and banks. In the general dynamics of a shifting and meandering alluvial river, materials will shift position by erosion at one riverbank point and material deposition at another point. Accordingly, at any given time on most natural rivers, including the Ohio River, riverbanks can be found to be eroding, other riverbanks in the process of healing, and still other riverbanks in stable condition. Erosion of riverbanks on the Ohio River, as a natural phenomenon, has been taking place for hundreds of years.

Climatic conditions greatly affect river dynamics. It is well established that during flood periods, when river flow velocities are high, riverbank erosion generally can be expected to occur in varying degrees depending on circumstances. Velocity of the flow of a river, it is conceded, plays a most important role in riverbank erosion. It is also clear that precipitation affects riverbank conditions and contributes to erosion thereof. Further, uses, urban and/or agricultural, to which riparian lands are put can also cause and/or contribute to erosion of riverbanks. Finally, the construction and operation of artificial structures on rivers can, under some circumstances, alter the hydrology of river flow characteristics, sediment propensities, etc., such as to affect the natural inclinations of river action and thereby induce riverbank erosion at points where it may not have occurred absent the artificial structures. In any discussion of erosion, factors of topography, soil composition and characteristics, and river site location play important roles in causative determinations.

◼ Improvement of the Ohio River for navigation purposes began in 1824. In 1878, a 6-foot canalization of the upper Ohio River began by construction of a system of locks and movable dams. Later a 9-foot canalization program throughout the entire length of the river was completed in 1929 with the construction of a system of 49 low-lift locks and dams. These low-lift dams had an estimated life of between 50–75 years. After the Second World War, there was a tremendous increase in river tonnage on the Ohio River. This, in turn, resulted in increases in the size of tows and barges on the river. This increased traffic and larger river vessels created delays at the low-lift dams and presented a serious obstacle to navigation on the Ohio River.[4]

4. There is no reliable evidence in the record which supports plaintiffs' allegations that the low-lift dams were filling with sediment, were otherwise deficient or failed to perform as intended, and thus had to be replaced. It seems to be conceded that these low-lift dams did not materially interfere with the downward course of the river and that they did not in many places materially raise the level of the water. While plaintiffs argue to the contrary, and the record is not crystal clear on the matter, the totality of the record supports the view that construction and operation of the low-lift dams did not abrogate the natural ordinary highwater mark which existed along the Ohio River prior to the construction of said dams. *See United States v. Cress*, 243 U.S. 316, 321, 37 S.Ct. 380, 382, 61 L.Ed. 746 (1917). It is conceded that during high water, *i. e.*, flood periods, the low-lift dams exercised no control over

In 1954, a modernization program to aid navigation on the Ohio River was undertaken. This program called for the construction of 19 high-lift locks and dams to replace the existing low-lift dams on the Ohio River. The high-lift dams on the Ohio River were constructed under the authority of the River and Harbor Act of March 3, 1909, 35 Stat. 817.[5] As of the date of trial, 17 of the high-lift dams had been constructed and were operational. One high-lift dam was under construction as of the date of trial, and construction of the last high-lift dam had been authorized. As a result of this modernization program, a smaller number of high-lift dams with larger locks eliminated the time-consuming and costly multiple lockages required by a greater number of low-lift dams and thereby improved navigation on the Ohio River. Three of these high-lift dams are involved in this litigation, i. e., the Meldahl Locks and Dam, the Cannelton Locks and Dam, and the Newburgh Locks and Dam.

Meldahl Dam is located some 436 river miles below Pittsburgh, Pennsylvania. Construction on this project began in 1959 and was completed in 1964. The normal pool elevation of 485 feet mean sea level (m. s. l.) was reached on March 28, 1965. Meldahl Dam replaced four low-lift dams (Nos. 31, 32, 33 and 34). The pool created by this dam covered some 96 river miles and terminated below the Greenup Locks and Dam. Eleven plaintiffs own land adjacent to the Ohio River within the Meldahl pool. In general, construction of the Meldahl Dam, and attendant impoundment of river water, raised the level of the Ohio River in the vicinity of the riparian lands of plaintiffs Chouinard, Griffith, McNelly, Poston, C. Rice, E. Rice, Schwab, Wood and Skelton by 24 feet, and in the vicinity of the riparian lands of plaintiffs Cunningham and Tolliver by 17 feet. It should be noted that there was only a 2-foot increase in the water level of the Ohio River in the upper reaches of the Meldahl pool as a result of the construction of the dam. There is no reliable evidence in the record as to whether or not the Meldahl Dam was constructed with a 12-foot channel capability. The dam was operated, as far as can be determined on this record, to provide a 9-foot channel. Flowage easements attendant to this project were obtained by the Corps by purchase or condemnation from riparian landowners during the period 1961–1963.[6]

Cannelton Dam is located approximately 3 river miles upstream from Cannelton, Indiana, and some 114 river miles downstream from Louisville, Kentucky. Construction on this project began in 1962, and the project was completed and dedicated in 1974. The normal pool elevation of 383 feet m. s. l. was permanently reached on August 17, 1972. Cannelton Dam replaced three low-lift dams (Nos. 43, 44 and 45). The pool created by this dam covered some 114 miles and terminated below the McAlpine Locks

the river and the river, during those periods, flowed in a natural, unobstructed manner.

5. Plaintiffs argue in their proposed findings of fact that the Corps was without authority from Congress to engage in this modernization program, relying on language in *Atchison, Topeka and Santa Fe Ry. Co. v. Callaway*, 382 F.Supp. 610, 617 n. 15 (D.C.Cir.1974), that, at best, can be considered dicta or an aside. As such, it is entitled to very little weight. *See Ingo v. Koch*, 127 F.2d 667, 677 (2d Cir. 1942). For subsequent history of the *Callaway* case see 431 F.Supp. 722 (1977) and 459 F.Supp. 188 (1978). There is absolutely no reliable evidence in this record which would support a finding that the high-lift dams in issue were constructed without congressional authority. Moreover, plaintiffs do not mention this argument in their briefs. Accordingly, as the matter is presented for consideration at this time, neither fact nor law have been advanced by plaintiffs which would justify a conclusion here that this modernization program was undertaken and completed, for the most part, without congressional authorization.

6. These flowage easements, in general, gave the United States Army, Corps of Engineers (the Corps) the perpetual right to permanently and/or occasionally overflow, flood and submerge riparian fast lands, i. e., lands above the ordinary high water mark (OHWM), above-stated elevations. These flowage easements also gave the Corps the continuing right to clear and remove, below stated elevations, timber, brush, debris and natural obstructions which in the opinion of the Corps may be detrimental to the dam projects.

and Dam at Louisville, Kentucky. Eleven plaintiffs own land adjacent to the Ohio River within the Cannelton pool. In general, construction of the Cannelton Dam, and attendant impoundment of river water, raised the level of the Ohio River in the vicinity of the riparian lands of plaintiffs Loesch, Bynon, Wagner and Leatherbury by 25 feet, in the vicinity of the riparian lands of plaintiffs Glenn, Purcell, J. McGehee (Tract 3828 E), Cox, Eaton and Williams by 16 feet, and in the vicinity of the riparian lands of plaintiffs E. McGehee and J. McGehee (Tracts 5101 E and 5112 E) by 9 feet. It should be noted that there was no increase in the water level of the Ohio River in the upper reaches, comprising about 20 percent of the total pool area, of the Cannelton pool as a result of the construction of the dam. The Cannelton Dam was constructed so as to provide for a 12-foot channel capability. However, at all times material herein, the dam has been operated to provide for a 9-foot channel and a normal pool elevation of 383 feet m. s. l. Flowage easements attendant to this project were obtained by the Corps by purchase or condemnation from riparian landowners during the period 1964–1967.

Newburgh Dam is located less than 2 river miles upstream from Newburgh, Indiana. Construction on this project began in 1965, and the project was completed and dedicated in 1975. The normal pool elevation of 358 feet m. s. l. was reached in January 1975. Newburgh Dam replaced two low-lift dams (Nos. 46 and 47). The pool created by this dam covered some 55 miles and terminated below the Cannelton Dam. One plaintiff, Dickenson, owned land adjacent to the Ohio River within the Newburgh pool. However, construction of the Newburgh Dam, and subsequent impoundment of river water, did not raise the level of the Ohio River in the vicinity of the riparian land of plaintiff Dickenson. Accordingly, it was not necessary for the Corps to acquire a flowage easement from plaintiff Dickenson. There is no reliable evidence in the record as to whether or not the Newburgh Dam was constructed with a 12-foot channel capability. The dam was operated, as far as can be determined on this record, to provide a 9-foot channel.

The high-lift dams were navigation dams. Their purpose was to maintain the river at a certain level during periods of low flow in order to float vessels. These dams were not designed to control floods by providing for reservoir-type storage of water. There were no flood control dams or reservoirs on the Ohio River. There were, however, flood control dams or reservoirs on tributaries of the Ohio River. The high-lift dams maintained the river at its appropriate depth by increasing or decreasing dam gate openings as required in order to hold the water level at normal pool stage. However, during periods of high flow, i. e., flood conditions, the gates of these dams are fully opened and these dams exercise no control over the river or its flow. As a result, during periods of high flow, the Ohio River is essentially flowing and acting in its natural state. In terms of flow, it was determined that when the river flow reached 325,000 cubic feet per second (cfs), the gates of these dams were fully opened, and an open, natural, and unrestricted river existed. Hydrographic data germane to the pool areas in issue showed that in 1966 river flow exceeded 325,000 cfs three times; in 1967 twice; in 1968 once; in 1969 none—a dry year; in 1970 no evidence; in 1971 four times; in 1972 four times; in 1973 four times; in 1974 four times; in 1975 four times; in 1976 two times; and 1977 none—a dry year. After recession of high river flow to the point where the gates can again control, the high-lift dams commence operation to maintain a normal pool level, i. e., 485 feet m. s. l. in the case of the Meldahl Dam, 383 feet m. s. l. in the case of the Cannelton Dam, and 358 feet m. s. l. in the case of the Newburgh Dam. It is to be noted that as a result of the rise in water level by high-lift dam impoundment, there was a smaller range of fluctuation from normal pool to flood stage and back down to normal pool than was the case before impoundment. It is also to be noted that during periods of low or normal flow, the high-lift dams do serve to reduce the velocity of flow through

their pools. As indicated earlier, velocity of river flow is a vital factor in riverbank erosion.

The record in this case clearly establishes that the construction and operation of these high-lift dams do not cause floods, or increase the number of floods, or affect flood peaks and time intervals, or increase the effect of flood events. These facts were confirmed by a study conducted by the University of Cincinnati, which study was prompted by charges that the high-lift dams had increased the number and frequency of floods on the Ohio River.

## II.

 It is well established that the Federal Government under the commerce clause of the Constitution, has the power to improve navigable waters in the interest of navigation. *United States v. Chandler-Dunbar Co.*, 229 U.S. 53, 70, 33 S.Ct. 667, 674, 57 L.Ed. 1063 (1913). It is likewise established, however, that if any such improvement on a navigable stream raises the water level in the river and thereby directly damages privately-owned property situated above the OHWM, the government is liable, on the theory of a fifth amendment taking, for the ensuing damages. *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 806–08, 70 S.Ct. 885, 889, 94 L.Ed. 1277 (1950); *United States v. Cress*, 243 U.S. 316, 320–21, 326–29, 37 S.Ct. 380, 384, 61 L.Ed. 746 (1917); *Goose Creek Hunting Club, Inc. v. United States*, 207 Ct.Cl. 323, 331, 518 F.2d 579, 583 (1975); *see Barnes v. United States*, 210 Ct.Cl. 467, 474–76, 538 F.2d 865,

870–71 (1976) and cases cited therein. In situations where governmental action in raising the level of navigable waters is the direct and proximate cause of resulting erosion on privately-owned property above the OHWM, the government has been held liable for such damages. *See United States v. Dickinson*, 331 U.S. 745, 750, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947); *Stockton v. United States*, 214 Ct.Cl. 506, 513–15 (1977). On the other hand, if there is no proper showing that governmental action was the proximate and direct cause of the erosion damage, there can be no liability on the part of the United States for a fifth amendment taking. *Yazel v. United States*, 118 Ct.Cl. 59, 70–73 (1950); *Coates v. United States*, 124 Ct.Cl. 806, 811–13 (1953). *See Sanguinetti v. United States*, 264 U.S. 146, 149–50, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924); *Matthews, Trustee v. United States*, 87 Ct.Cl. 662, 719–20 (1938).

 The erosion issue in these cases is not legal, it is factual. The question to be resolved is whether the construction and/or operation of the involved structures was the direct and proximate cause of the erosion which has taken place, and is taking place, on plaintiffs' riparian lands. Plaintiffs maintain that the impoundment of water by the construction of the Meldahl and Cannelton Dams raised the level of the Ohio River in the vicinity of their riverbank properties thereby permitting wind and vessel waves to erode their riverbanks at higher levels than was the case before impoundment.[7] As noted earlier, the water level in

---

7. Plaintiffs claim that the damages they seek are for erosion to their "fast" lands above the OHWM. Flowage easements were acquired from plaintiffs covering lands above the OHWM (*see* note 6, *supra*). In view of the fact that compensation was paid to plaintiffs for these flowage easements, *i. e.*, they were not gratuitous conveyances, plaintiffs' right, absent other considerations (*see* note 11, *infra*), to recover for erosion damages within the flowage easement areas is most doubtful. *See Stockton v. United States*, 214 Ct.Cl. 506, 515–18 (1977). There is no reliable evidence of overreaching or actionable misrepresentation on the part of Corps personnel in obtaining these flowage easements. As noted by the court in *Stockton*

*v. United States, supra*, 214 Ct.Cl. at 515, defendant's acquisition under normal conditions, which is the situation herein, of a flowage easement, " * * * would not carry with it any warranty that the water would always be smooth. If the impounded water were wide enough for waves to build up, and if the land were easily erodible, it would be up to the owner to exact compensation for the added exposure, or else to protect himself by riprapping or other engineering measures * * *." The language to be found in flowage easement acquisition documents, *e. g.*, warranty deeds and stipulation of the parties attest to the fact that the compensation paid for said flowage easements was in full satisfaction of any and all claims arising out of

the vicinity of the riparian land of one plaintiff, Dickenson, was not raised. It is important to note that plaintiffs contend that wave action is the mechanism, or cause, of the erosion on their properties. There is no support in this record for plaintiffs' bald allegation in their brief that the groundwater table, which plaintiffs assume is directly related to the rise in pool water level, weakened the banks and made them more susceptible to wave action and slumping. The record indicates that one cannot presume that merely because the pool level was raised the water table on adjoining land must also be deemed to have been raised. In some areas the water table may have been raised whereas in other areas the water table may not have been raised. In maintaining that the involved structures were directly and proximately responsible for the erosion damage on their banks, the burden of proof rests on plaintiffs, and not on the defendant, to establish that a taking has occurred justifying the payment of just compensation. *United States v. 329.05 Acres of Land*, 156 F.Supp. 67, 71 (S.D.N.Y. 1957), *aff'd* 263 F.2d 331 (2d Cir. 1959); *see United States ex rel. T. V. A. v. 137 Acres of Land*, 406 F.2d 1283, 1287 (6th Cir. 1969).

The trial session in these cases was lengthy and the trial record voluminous, facts confirmed by the extensive findings of fact accompanying this opinion. The factual conclusions reached herein are more fully discussed in those detailed findings.

The plaintiffs who did testify in these cases established clearly that erosion, in varying degrees, was taking place on their riverbank properties. Defendant concedes this fact. However, it must be borne in mind that "[p]roof of damage alone does not necessarily prove a taking." *Yazel v. United States, supra*, 118 Ct.Cl. at 72. As

to the cause of the erosion, the testimony of plaintiffs, to the extent that the matter of causation was addressed by them, was to the effect that the erosion on their riverbanks was not a problem until after the dams were constructed and the water impounded. Accordingly, they reason, the high-lift dams must be responsible for the erosion. This "post hoc, ergo propter hoc" (after this therefore on account of this) approach to causation is most unpersuasive in the context of this record.[8] It is an approach that was rejected in *Yazel v. United States, supra*, 118 Ct.Cl. at 70–73, where riparian landowners maintained that the bank line of their land had been previously stable, but that after the construction of a levee by Army Engineers many acres of the bank lands were eroded away, all of which, the landowners claimed, was the result of the construction of the levee.

■ Erosion on rivers and streams is an extremely complex matter from the point of view of its genesis, its effects and its prevention. Why some banks erode and other similar ones do not is not fully known. A number of variables are involved in the erosion process and these variables may exert their influence individually or in a complex combination, in which case erosion becomes more difficult to understand, predict and treat. In short, the cause(s) of erosion cannot be reduced to simple answers. As a result, these are cases where the testimony of experts is particularly appropriate since the trier of fact is presented with evidence of a highly technical nature involving geotechnical, hydrologic, hydraulic, geological and climatic matters. *See Gisriel v. Uniroyal, Inc.*, 517 F.2d 699, 702 (8th Cir. 1975).

Plaintiffs engaged as their sole expert witness, Dr. Wayne R. Lowell (Lowell), a

---

said taking. The testimony of the plaintiffs indicates their awareness of erosion potential at or about the times the flowage easements were being acquired. There is no evidence in this case of express reservations by plaintiffs herein for any future erosion damage to their lands. *Compare Tri-State Materials Corp. v. United States*, 213 Ct.Cl. 1, 4, 550 F.2d 1, 3 (1977).

8. The record suggests that plaintiffs generally were really not attentive to river action on their banks prior to construction of the involved dams. However, after the dams were constructed their attention became more concentrated on their banks in anticipation of erosion problems. It seems clear that erosion in varying degrees was taking place on riverbank properties in these pool areas prior to construction of the dams.

retired geology professor, who, at time of trial, was a consulting geologist involved primarily in the exploration of mineral deposits. He had no professional expertise in river mechanics. Lowell was engaged to serve as an expert some 3 to 4 weeks before trial. He readily conceded that time constraints precluded a thorough and detailed investigation of matters germane to the opinion he advanced at trial that the raising of the water level by impoundment of the river by the dams in question was directly responsible for the erosion on plaintiffs' banks. Lowell's testimony indicates that he considered the construction of the high-lift dams and attendant pool rises as the sole causative factor for the erosion on the plaintiffs' banks and that he failed to give reasonable consideration to other clearly shown possibilities which might serve to explain said erosion on these banks.[9] Lowell's opinion was, at best, a naked one, lacking supportive empirical data and study. It has been observed that opinion evidence is only as good as the facts upon which it is based. *State of Washington v. United States*, 214 F.2d 33, 43 (9th Cir.),

*cert. denied*, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954). *See also United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966). Accordingly, Lowell's opinion as to erosion causation was not very helpful to the trier of fact and was deemed unpersuasive.[10]

Lowell testified that 99.5 percent of bank erosion on a river takes place during periods of floods or high water. All of defendant's experts agreed that over 90 percent of riverbank erosion is caused by floods or high water. The testimony of some of the plaintiffs clearly supports these views of the experts. Lowell ostensibly believed, incorrectly it might be added, that the construction of the high-lift dams increased the frequency of floods. Otherwise, his testimony above is definitely at odds with the opinion he offered that the rise in pool levels was the primary cause of the erosion on the plaintiffs' riverbanks. Lowell believed that the energy (velocity) of a river brings about all erosion and that this energy, which can be reflected in the rate of river flow, is greatest at times of high flow or floods. Since, as has been indicated pre-

---

**9.** Lowell visited the banks of only three plaintiffs. The banks of these three plaintiffs were located in the Cannelton pool in areas that were historically unstable and subject to landslides. The record establishes that the slipping and sliding of the banks of these plaintiffs was due primarily to the inherent instability of the colluvial soils as aggravated by climatic conditions and was not due to the raising of the water level by dam impoundment. Lowell did not visit any other site in the Cannelton pool, nor did he visit any site in the Meldahl or Newburgh pool. Lowell conceded he had never been in the Meldahl pool and was unfamiliar with said pool area. Instead, Lowell reviewed 1977 photographs, placed in evidence by defendant, of the banks of the other plaintiffs and concluded from the erosion depicted in said photographs that said erosion reflected therein was caused by the raising of the water levels in the involved pools. Lowell made no study of the matter; he did not review any hydrological, hydraulic, soils, or climatic data in reaching his opinion. He conceded such data would have been helpful in reaching an opinion on the matter. Lowell was unable to explain why erosion in the upper 20 percent of the Cannelton pool where the water level was not raised at all despite the construction of the dam was similar to the erosion in the lower portions of the pool where the water level was raised up to 25 feet in places. Such facts suggest most strongly that erosion causes, other than the raising of the water level by dam impoundment, were at work in the pool areas.

**10.** Lowell was undoubtedly influenced by the conclusions reached in an August 1977 Water Resources Development Report on the Missouri River prepared by the Corps of Engineers, Missouri River Division, which he relied on in reaching his opinion, to the effect that the construction of large hydroelectric flood control dams on the Missouri River was responsible, in some measure, for the erosion which occurred on the banks of said river. Lowell had no working relationship, nor personal familiarity with the Missouri River. The record establishes, however, that this report harbors little relevance to the operation and impact of the high-lift navigation dams on the Ohio River. One of defendant's witnesses, Daryl B. Simons, a creditable and experienced expert in the field of erosion, sedimentation, river mechanics and related problems, had worked on the Missouri River and persuasively explained that the Missouri River Dam system was totally different from the Ohio River Dam system such that one could not extrapolate conclusions from the Missouri River Dam system and its effect on riverbank erosion and have them applicable to the Ohio River Dam system.

viously, the high-lift dams exercise no control over the river during periods of flood or high river flow, it seems reasonable to conclude that most of the erosion damage on the plaintiffs' banks is not due to the impoundment of the river but is due to floods and high water. Because these floods or high waters would have occurred absent the presence of the high-lift dams, there is strong reason to find that the erosion plaintiffs complain of is not related to or caused by the construction and operation of the dams in question. *See Yazel v. United States, supra,* 118 Ct.Cl. at 70–71; *Coates v. United States, supra,* 124 Ct.Cl. at 811–12.

 As indicated earlier, plaintiffs contend that wave action, wind and tow and/or barge, was the primary mechanism for erosion on their banks. Lowell initially testified in a most generalized manner, that the erosion complained of was caused by undercutting of the banks by wave action. This opinion of Lowell's was not supported by any study or data. Too, it must be remembered, he only visited the sites of three of the 23 plaintiffs, and he never talked to a single plaintiff relative to conditions on their banks. Factual support for his opinion in this regard is clearly lacking, and his opinion, as a result is entitled to little weight. *See State of Washington v. United States, supra.* Later, in his testimony, Lowell conceded that wind-generated waves were not too important as an erosion causing factor in these cases. Studies conducted by defendant, which were available to Lowell but were not reviewed by him because of time constraints, established, *inter alia,* the fetch conditions (distance for waves to build up) pertinent to each of the banks in issue and suggest rather per-

suasively that wind wave action had no significant erosive effect on these banks. As to river traffic waves, Lowell admitted that generally the force of these waves might well be dissipated before they hit the shoreline. The record does suggest that, to the extent river traffic operated close to the shoreline, waves generated by such traffic could have some impact on the shoreline. It is conceded that raising the water level in the pool by impoundment enabled river traffic, in some instances, to come closer to the shoreline than was the case prior to impoundment. However, there is no evidence in the record of the frequency and/or impact of such occurrences as to each of the properties in issue. Such testimony as is in the record relating to river traffic and its potential for erosion is most generalized and lacking in specificity.[11]

In contrast to plaintiffs' approach to the issue of erosion, which can be characterized as generalized and lacking in investigative detail and study, defendant, through the Corps, engaged in a comprehensive and most detailed study of erosion throughout the Cannelton and Meldahl pools in general and on each of the plaintiffs' properties in particular. While the impetus for this study undoubtedly was the instant litigations, the scope of the study itself was much broader. The study was directed at system mechanics and basic causes of erosion along Ohio River banks. The Corps was as interested as the litigants in knowing whether the navigation dams were responsible for the erosion of riparian lands on the Ohio River. It might be added that the Corps, as attested to by its study report on the Mis-

---

11. The size of the waves hitting their riverbanks at normal pool stage, as suggested in the testimony of plaintiffs, was not such as to cause the significant erosion damage taking place on the high banks about which plaintiffs complain. The distance from the land-water interface at normal pool stage to the high bank erosion areas was such that wave action could not reach these areas. More importantly, waves generated by floods and high water would have occurred on the banks at higher levels absent the construction of the dams. The record supports the view that any wave-generated erosion, whether by wind or river vessel, would be insignificant and subsumed by the erosive forces of high waters or floods which would have occurred absent the dams. Such a conclusion also serves to dispose of plaintiffs' contentions regarding shoreline armoring and tree and sandbar protection. Accordingly, wave action has not been shown to be a substantive erosion factor significantly attributable to the construction and operation of the dams in question. *See Yazel v. United States,* 118 Ct.Cl. 59, 71–73 (1950); *Coates v. United States,* 124 Ct.Cl. 806, 811–13 (1953).

souri River, referred to previously, was not adverse to attributing erosion to Corps' dams if the facts, as determined by an appropriate study, showed this to be the case. The findings of fact set forth in great detail the nature and scope of this study. This study, which covered a wide range of various disciplines, was conducted by professional and competent personnel and engendered in the trier of fact a sense of reliability and fairness. Suffice it to say, that defendant's investigative study, resulting data, and conclusions drawn therefrom are entitled to great weight in resolving the erosion issue now before the court. The bottom line of the study was that the erosion taking place on plaintiffs' riparian lands was not caused by or related to the construction and operation of the high-lift navigation dams in issue.

Defendant presented a number of expert witnesses. The chief consulting experts engaged by defendant were Dr. D. Joseph Hagerty (Hagerty), Dr. Daryl B. Simons (Simons) and Dr. Stanley A. Schumm (Schumm).

Hagerty, at time of trial, was an associate professor of civil engineering and an associate in the Department of Geology at the University of Louisville in Louisville,

Kentucky. In addition to his teaching responsibilities, Hagerty performed engineering consulting work. For example, he was retained, as part of a study group, to investigate geological aspects of groundwater flow in Jefferson County, Kentucky, particularly downtown Louisville in 1972 and thereafter. He was also involved in the preparation of environmental impact statements for the Corps relative to establishment of the pools of the Cannelton, Newburgh and McAlpine Locks and Dams on the Ohio River. As a result, Hagerty had a working familiarity with the Ohio River prior to 1977, when he was engaged by the Corps to head up the erosion investigative study team.

Hagerty was a knowledgeable, well-informed, well-prepared and creditable witness. In his approach to the matter of erosion, Hagerty considered all possible causes for the erosion which was taking place on plaintiffs' banks, including the high-lift dams.[12] After consideration of the mass of data assembled by the study investigation group, and having viewed firsthand each of the plaintiffs' riverbank properties,[13] and having conducted reconnaissance of the entire Cannelton and Meldahl pools,[14]

12. Hagerty believed that the major cause of the erosion in question was high water or floods. Floods, annual occurrences on the Ohio River, saturated the banks. The velocity of river currents during flood periods created erosive forces which removed and/or reworked materials on said banks. When flood waters receded, materials were rendered subject to slumpage and erosion by a process called drawdown. Another important erosion cause or mechanism, noted by Hagerty, taking place on some of the banks was piping. This concept described the flow of groundwater preferentially through previous layers of bank materials on a gradient from the land to the river, exiting at the face of the banks taking with it bank materials. On still other sites, Hagerty noted landslide conditions which were responsible for bank slippage and sliding, which conditions were exacerbated by the wet climatic conditions of the early 1970's. Hagerty also noted that the urban and agricultural uses of the properties in many cases contributed to the erosion process by the introduction of water onto the properties which thereafter flowed toward the river with some erosive ramifications.

13. Hagerty inspected all of the plaintiffs' riparian lands. Indeed, he inspected all but one site at least twice. He offered his opinions as to the causes of the bank erosion taking place on each of these sites (see note 12, supra). His opinion, as to each site where the rise in water level was claimed to be the cause of the erosion, was that the rise in pool level was not responsible for said erosion. As to the Dickenson property, where there was no rise in pool level, Hagerty was of the opinion that the soil materials in the banks were most susceptible to erosion which was aggravated by land use on the property and lateral water flow on a gradient from the land through the bank, pulling materials therefrom to the river. He also noted that the area of erosion on the Dickenson banks was some 40 to 60 feet from the water's edge in an area that reflected drainage problems. Hagerty's opinions were deemed well presented, supported by the record, and persuasive.

14. Hagerty noted in his investigation that erosion was taking place on high banks some distance from the land-water interface of the normal pool stage. He noted that erosion was

and having monitored selected riverbank properties, by piezometers and otherwise, Hagerty offered the opinion that the erosion taking place on each of the claimant's riverbanks was not caused by or related to the construction of the Cannelton, Meldahl and Newburgh navigation dams. Hagerty's opinions, on this record, are entitled to great weight.

Simons, at time of trial, headed up all research projects at Colorado State University. Prior to acceptance of that position, Simons had been involved in the civil engineering field, with emphasis on problems, *inter alia*, of erosion, sedimentation, river mechanics and related matters, as a professor at the University of Wyoming and as an employee at the United States Geological Survey. He has worked on research projects on domestic, *e. g.*, the Mississippi, Missouri and Colorado rivers, and international rivers, *e. g.*, the Nile River. Simons testified as an expert on hydraulic and sedimentation matters.[15] Simons was a knowledgeable, experienced, informed and creditable witness.

Simons personally visited the sites of all the plaintiffs except those of plaintiffs Skelton and Tolliver. He also surveyed the Cannelton and Meldahl pool areas generally. He reviewed the study data, especially

the hydrological data, assembled by the Corps, and prepared a report setting forth his conclusions and supporting reasons. A report on his findings and conclusions relative to the erosion matter in issue was in evidence. The totality of the testimony and the report of Simons supports the conclusion that the erosion on the plaintiffs' banks was not directly caused by or significantly related to the construction and operation of the high-lift dams in issue.[16]

Schumm obtained a Ph.D. in geomorphology from Columbia University in 1955, with emphasis on drainage and erosion patterns and problems. He worked for the United States Geological Survey for 12 years, dealing most of the time with erosional problems in the western United States. Since 1967, Schumm has served as a professor of Geology at Colorado State University, in its Department of Earth Resources, where he spends half his time teaching and the other half in research work. In the course of his professional work, Schumm had studied a number of rivers, *e. g.*, the Mississippi, Arkansas, Platte, Yellow and Cimarron rivers. He was eminently qualified to offer expert opinions on river matters, especially erosion.

Schumm visited the riverbank sites of all the plaintiffs except Tolliver and Skelton,

taking place on riverbanks in the Cannelton pool in areas where there was no rise at all in the level of the water. In other areas where the land-water interface was protected by armoring, erosion was occurring higher up on the riverbanks. These were also areas in the Cannelton pool where the water level was raised where no erosion was occurring at all. Similarly, in areas of the Meldahl pool when the rise in water level was only 2 feet, the erosion noted in said areas was comparable to the erosion taking place in areas of the Meldahl pool where the rise in water level was close to 30 feet.

15. Simons' professional experience in matters of sedimentation and his analysis of available Ohio River data gives added weight to his conclusion that the construction of the high-lift dams did not result in a build-up of sedimentation in the Ohio River, a conclusion contrary to one reached by Lowell who did not rely on any Ohio River data or investigation. In Simons' opinion, sediment in the Ohio River system at the present time is transported for all practical purposes in exactly the same way it was transported before navigation dams were installed

on the Ohio River. Simons also persuasively refuted Lowell's contention that after the high-lift dams had impounded the water, the created pools had characteristics of glacial lakes.

16. Simons agreed with Lowell that some 99.5 percent of erosion that occurs on riverbanks results from high water or flood conditions. He also observed that when the flow of the Ohio River reached 325,000 cubic feet per second (cfs), reflecting flood conditions, the high-lift dams on the Ohio River exercised no control over river flow or its velocity (*see* text at page 11, *supra*). As to the protection offered by sandbars and armoring to erosion from waves, Simons observed that sandbars were transient things which were created by river action and changed and removed by river action. He viewed sandbars, armoring, etc., as inadequate protective devices against river erosion during periods of floods since the high waters with attendant high velocities operate against the high banks above these sandbars and armored sites.

and, as to those two sites, he did look at riverbanks generally in the areas where those two properties were located. He also spent 4 days in making a general reconnaissance of the Cannelton and Meldahl pools by boat, and another day in making a reconnaissance over the river by helicopter. In these reconnaissance efforts, which gave Schumm a broad overview of general river conditions, Schumm noted that while some banks in these pools were eroding, other banks, that had suffered from past erosion, were healing and stabilizing by vegetation regrowth and sediment deposition, and still other banks were completely stable. He noted that erosion within the pools was varied, i. e., it was not confined to any specific area. He observed that erosion similar to that taking place on plaintiffs' banks was also taking place in those areas of the Cannelton pool where the water had not been raised at all and in those areas of the Meldahl pool where the water rise was only 2 feet. He further observed that most of the erosion on plaintiffs' banks was taking place at elevations significantly above the normal level of the pools, i. e., some distance away from the landwater interface at normal pool. During his investigations of the pools in question, Schumm saw no significant evidence of wave action as a causative factor for the erosion he noted on the riverbanks of plaintiffs. Schumm prepared a report containing his findings and conclusions on the erosion matter in issue.

Schumm discussed each of the plaintiffs' properties in issue, including the Tolliver and Skelton sites which he did not personally visit but which were in areas which he did view and observe. He agreed with the other experts that most of the bank erosion on rivers, including the Ohio River, takes place during periods of floods when the velocity of flow is highest. He also reviewed the mass of data assembled by the Corps' investigative study, including the soils and hydrological data, as well as other pertinent data in the record. Schumm concluded, after his study of the matter, that there was no direct and significant relationship between the raising of water levels of the Cannelton and Meldahl pools and the erosion taken place on the properties of plaintiffs. He also gave his opinion of the most probable causes of the erosion taking place on plaintiffs' banks. In general, he corroborated Hagerty's views as to the most probable causes of the erosion taking place at those sites. Schumm's opinions and conclusions are entitled to considerable weight.

While there are many areas of conflict and dispute in the record, all the experts in these cases agreed on one significant fact, i. e., that over 90 percent of the erosion that occurs on rivers and streams is due to flood conditions. Since it has been accepted herein that the high-lift dams do not increase the frequency, duration or peaks of the floods on the Ohio River, it follows that the erosion on plaintiffs' banks most probably would have occurred absent the construction and operation of the high-lift dams. *United States v. Sponenbarger*, 308 U.S. 256, 266 (1939); *Yazel v. United States, supra*, 118 Ct.Cl. at 71 and 73; [17] see *Coates v. United States, supra*, 124 Ct.Cl. at 812.

17. There are significant parallels between the *Yazel* case and the instant litigations. The circumstances in both litigations involve the construction of governmental structures on an alluvial river, one of the characteristics of which is erosion of its banks, which is subject to annual floods. The court in *Yazel* noted that the banks of such a river, even if stable for many years may, after prolonged exposure and saturation due to flood conditions, suddenly collapse. The court in *Yazel* also noted that a survey of the involved Kansas River in 1940 indicated that 40 of the 160 miles of said river were active in various degrees of erosion (118 Ct.Cl. at 69). These observations have pertinent applicability to the instant litigation. The court in *Yazel* was not impressed with the contention of plaintiffs therein that their banks were stable before the structure (a levee) was built so the erosion that occurred on their banks afterwards must have been due to the construction of the structure (118 Ct.Cl. at 70–71). In both litigations it was shown that floods were the primary cause of the erosion (118 Ct.Cl. at 71–73). In both litigations it was not satisfactorily established that the accused structures increased the frequency, duration or peaks of floods (118 Ct.Cl. at 71). The denial of the erosion claims in the *Yazel* case supports the denial of the erosion claims in this litigation.

As noted earlier, plaintiffs have the burden of proving, by a preponderance of the evidence, that the construction and operation of the navigation dams in issue were the direct and proximate cause of the erosion damages suffered by them on their riparian banks. *United States ex rel. T. V. A. v. 137 Acres of Land, supra; United States v. 329.05 Acres of Land, supra.* Plaintiffs, on this record, have failed to carry their burden in this regard. Their erosion claims must be denied.

## III.

Plaintiffs contend that in the acquisition of flowage easements in connection with the Meldahl and Cannelton Dam projects, the Corps was guilty of fraud and misrepresentation.[18] Plaintiffs use the terms "fraud" and "misrepresentation" most loosely and in a very generalized manner in attacking various actions of the Corps which were pursued in the Corps' flowage easement acquisition programs. In their proposed findings of fact, plaintiffs set forth a barrage of charges against the Corps which they proffer as proof of fraud and misrepresentation. Each of these charges has been covered, and found lacking in merit, in the findings of fact which accompany this opinion.[19] Accordingly, this opinion will discuss only those specific contentions of fraud and misrepresentation which plaintiffs deemed important enough to highlight in their briefs.

With reference to the acquisition of flowage easements, which underscores plaintiffs' claims of fraud and misrepresentation, it is necessary to separate plaintiffs into three categories. In the first category are those plaintiffs who, after successful negotiations, conveyed flowage easements to the Corps by warranty deed;[20] in the second category are those plaintiffs from whom, after unsuccessful negotiations, flowage easements were acquired by district court judgments on declarations of taking;[21] and in the third category are

---

18. As noted previously, a flowage easement was not acquired from plaintiff Dickenson whose property was located in the Newburgh Dam pool. As a result, there is no basis for a claim of fraud and misrepresentation against the Corps on the part of Dickenson.

19. For example, there was nothing improper with the Corps advising riparian landowners affected by the projects of the government's right of condemnation in connection with flowage easement acquisitions. *Beatty v. United States*, 144 Ct.Cl. 203, 205–07, 168 F.Supp. 204, 206 (1958). Further, with respect to the applicability of state law relative to the preparation, execution and recordation of the flowage easements in issue, it is sufficient to note the federal law, not state law, controls. *Kohl v. United States*, 91 U.S. 367, 374, 23 L.Ed. 449 (1875). *See United States v. Haddon*, 550 F.2d 677, 682 (1st Cir. 1977); *see also Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). Finally, with respect to plaintiffs' constant reference to federal assistance programs covering federal, state and local riparian landowners to protect against bank erosion by riprap and other measures, it is worth noting the observation of the Supreme Court in *United States v. Willow River Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 763, 89 L.Ed. 1101 (1945) that "[i]f damages from any other cause [than a taking] are to be absorbed by the public they must be assumed by act of Congress and may not be awarded by the courts."

20. Plaintiffs Bynon, Cox, Cunningham, J. McGehee and E. McGehee. Since Cunningham did not testify, there is, in any event, no basis herein for a claim of fraud and misrepresentation against the Corps as to the acquisition of a flowage easement on his property.

21. Plaintiffs Loesch, Glenn (Tract 2218 E and 2410 E), Poston, Purcell, Schwab and Skelton. Since Poston and Skelton did not testify, there is, in any event, no basis for a claim of fraud and misrepresentation against the Corps as to the acquisition of flowage easements on their properties. There is no contention here that the district courts lacked jurisdiction or that their judgments on these matters are invalid. *See Evers v. Watson*, 156 U.S. 527, 531, 15 S.Ct. 430, 432, 39 L.Ed. 520 (1895). The record herein will not support any charge of fraud sufficient to set aside these judgments. *See Evers v. Watson, supra*, 156 U.S. at 533–34, 15, S.Ct. at 432–433. Under such circumstances *res judicata* would seem to bar these plaintiffs from relitigating herein matters subsumed in the district court judgments. *See Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *Oglethorpe Co. v. United States*, 214 Ct.Cl. 551, 557, 558 F.2d 590, 594 (1977). *Cf. Vanada v. United States*, 202 Ct.Cl. 1121, 1122–23 (1973). Unfortunately, the parties did not address this *res judicata* point in any helpful manner in their briefs.

those plaintiffs who obtained the properties in issue after the flowage easements in issue were acquired by the Corps.[22]

 Fraud has been defined as conscious wrongdoing with an intention to cheat or be dishonest. *United States v. Wunderlich*, 342 U.S. 98, 100, 72 S.Ct. 154, 155, 96 L.Ed. 113 (1951). It is important to note that there is a presumption that public officials, *i. e.* Corps personnel, perform their duties in a proper manner. *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). A charge of fraud must be substantiated by clear and convincing proof rebutting every presumption of honesty and fair dealing. *DuBois Constr. Corp. v. United States*, 120 Ct.Cl. 139, 175, 98 F.Supp. 590, 597 (1951). The degree of proof necessary to establish fraud demands more than a preponderance of the evidence, it demands "clear and convincing" evidence. *Hageny v. United States*, 215 Ct.Cl. 412, 428, 570 F.2d 924, 933 (1978). Further, fraud will not be presumed, and it must rest on something more substantial than suspicion, speculation, or a hint of fraud. *Hageny v. United States, supra*, 215 Ct.Cl. at 436, 570 F.2d at 937. There is no reliable evidence in this record which would support a charge that the Corps, in acquiring flowage easements from plaintiffs engaged in conscious wrongdoing with an intent to cheat or be dishonest with them. Such evidence that is present in the record reflects an honest effort by the Corps to be fair and forthright with all riparian landowners, including plaintiffs, in all matters relating to the dam projects. *Cf. Kirkendall v. United States*, 90 Ct.Cl. 606, 614, 31 F.Supp. 766, 770 (1940). Plaintiffs have failed to carry the heavy evidentiary burden placed upon them relative to the fraud charges they have raised in this litigation. *See Law v. United States*, 195 Ct.Cl. 370, 440–53 (1971); *Eastern School v. United States*, 180 Ct.Cl. 676, 694–98, 381 F.2d 421, 431–34 (1967).

It would appear that the misrepresentation plaintiffs deem actionable herein consists of allegations that the Corps knowingly made false representations to plaintiffs in order to induce plaintiffs, in reliance on said false representations, to enter into flowage easement agreements or to otherwise accept the flowage easements without protest or without seeking additional compensation to their detriment and damage. *See LaCrosse Garment Mfg. Co. v. United States*, 193 Ct.Cl. 168, 175, 432 F.2d 1377, 1381–82 (1970).

While not clearly spelled out in their briefs, plaintiffs ostensibly contend that the Corps represented that the high-lift dams, especially the Cannelton Dam, would eliminate erosion problems;[23] that the Corps knew, or should have known, that erosion would occur as a result of construction of the high-lift dams because of experience it

---

**22.** Plaintiffs Chouinard, Eaton-Williams, Glenn (Tract 2215 E), Griffith, Leatherbury, McNelly, E. Rice, C. Rice, Tolliver, Wagner, and Wood. Since the Corps had no dealings with these plaintiffs in the acquisition of the flowage easements in issue, there is no basis for any claim of fraud and misrepresentation against the Corps on the part of these plaintiffs. Further, the record is devoid of any reliable evidence as to fraud and misrepresentation relative to the acquisition of flowage easements on these properties. Finally, since these plaintiffs did not own the properties in question at the time the flowage easements thereon were acquired by the Corps, they are not the persons entitled to compensation if, in fact, additional compensation is due relative to said flowage easement acquisitions. *United States v. Dow*, 357 U.S. 17, 20, 78 S.Ct. 1039, 1043, 2 L.Ed.2d 1109 (1958); *Lacey v. United States*, 219 Ct.Cl. 551, 560, 595 F.2d 614, 619 (1979).

**23.** Corps personnel did advise plaintiffs that raising the water level on the banks would tend to stabilize the banks up to the water level because of the weight of the water against the banks, a view supported by the experts who testified in this litigation. Plaintiffs were also advised that the high-lift dams would reduce, at normal pool levels, the velocity of flow in the river, a view also supported by the experts in this litigation. Corps personnel made no representations that erosion would be eliminated as a result of the construction of the high-lift dams. There were absolutely no statements by Corps personnel that the high-lift dams would reduce the frequency, duration or peaks of floods on the Ohio River, and plaintiffs do not aver that any were made, and these matters are the crucial determinative factors in these cases, as was noted previously in this opinion.

922

had with the low-lift dams;[24] and that plaintiffs relied on the Corps' representations in entering into the flowage easement agreements.[25] The facts of record will not support these contentions.

The record indicates that there were discussions between the Corps and some of the plaintiffs relative to the problem of erosion. As might be expected, there is conflict in the recollections of the witnesses on both sides as to what was said on the matter. The record suggests that any discussions by Corps personnel with plaintiffs on the matter of erosion manifested at best expressions of opinion or expectation given in circumstances which must have identified them as such, rather than flat representations of fact. Such discussions will not support a claim for misrepresentation. *See Aerojet-General Corp. v. United States,* 199 Ct.Cl. 422, 432–33, 467 F.2d 1293, 1299–1300 (1972); *Phillips Petroleum Co. v. Rau Constr. Co.,* 130 F.2d 499, 501 (8th Cir. 1942). Synthesizing the matter, the record supports the view that Corps personnel made no actionable representations that erosion problems would be elimi-

nated or reduced by the construction of the high-lift dams.

### a) Aerial Surveys

In their briefs, plaintiffs contend that the Corps utilized aerial surveys which, they seem to say, produced data that was inaccurate and unreliable. Plaintiffs seem to imply that the Corps deliberately used aerial surveys knowing that such a procedure would produce results which would enable the Corps to pay less for more flowage easement land by means of inaccurate descriptions of said easements. Plaintiffs do not say whether these allegations are grounded on a claim of fraud or on a claim of misrepresentation. There is no evidence in the record which will support such allegations.

In obtaining information for the preparation of flowage easement documents, the Corps relied, *inter alia,* on aerial surveys of the riverbank areas of the Cannelton pool by a reputable and experienced firm. By a process called photogrammetry, photographic data from the aerial surveys was converted into maps with appropriate con-

24. The record does not indicate the Corps had any problems with the low-lift dams, particularly with respect to riverbank erosion. The testimony of Corps personnel does not show that they anticipated, or should have anticipated, erosion problems because of the construction of the high-lift dams. The record indicates that erosion on rivers and streams is most unpredictable, a fact confirmed by the testimony of the experts. This unpredictability certainly weakens plaintiffs' contentions as to what the Corps knew or should have known as to erosion on any particular piece of property. Hooper, one of the Corps' negotiators with landowners in the flowage easement acquisition program, testified that when erosion questions were raised by landowners he advised them that he did not know whether there would be erosion in the future, and that he did not know whether present erosion would continue and/or increase. The Corps had no special knowledge as to when floods would occur in the future, or which riverbanks would erode and which would not erode. The circumstances in these cases do not fit into the mold of those government contract cases cited by plaintiffs, *e. g., Helene Curtis Indus., Inc. v. United States,* 160 Ct.Cl. 437, 443–45, 312 F.2d 774, 778–79 (1963), which hold that where the government possesses special knowledge, not

known to a contractor, which is vital to performance of the contract, the government has an affirmative duty to disclose such knowledge to the contractor. Interestingly, there was testimony from some of the plaintiffs that they expected erosion to occur as a result of the dam projects. Under these circumstances, the cases relied on by plaintiffs work against them. *See Helene Curtis Indus., Inc. v. United States, supra,* 160 Ct.Cl. at 446, 312 F.2d at 779; *see also, L. M. Jones Co. v. United States,* 178 Ct.Cl. 636, 653–54 (1967).

25. The record supports the view that plaintiffs did not rely in any significant manner on any statements about erosion by Corps personnel relative to acquisition by the Corps of flowage easement. This is certainly true with respect to those plaintiffs from whom flowage easements were obtained by condemnation (*see* note 21, *supra*) or those plaintiffs who acquired properties after the flowage easements were obtained (*see* note 22, *supra*). As to other plaintiffs who negotiated with the Corps and conveyed flowage easement warranty deeds to the Corps (*see* note 20, *supra*), some flatly testified they did not believe anything Corps personnel said relative to the problem of erosion.

tour and elevation data. United States Geological Survey maps are prepared in this same manner. The accuracy of these maps conformed to that required by the National Standards of Map Accuracy. These maps were subsequently field checked for accuracy and any discovered errors were corrected before the data was utilized by the Corps.

Plaintiffs challenge the use of these aerial surveys in preparing the legal descriptions describing the flowage easements taken on plaintiffs' properties. The essence of their complaint is that the accuracy of the photogrammetric process has not been authenticated at each step by appropriate individuals.[26] Plaintiffs, in my mind, have raised an immaterial issue. The question, regardless of how it was done, is whether the descriptions set forth in the acquisition documents accurately reflected and described the flowage easements taken from plaintiffs. The only reasonable answer that can be drawn from this record is an affirmative one. Plaintiffs have failed to prove that the flowage easement descriptions as to each property in issue were erroneous. It is found, instead, that the Corps has, in fact, accurately described the various lands in which it intended to, and did, take flowage easements. *See* in this regard *United*

*States v. 21.54 Acres of Land*, 491 F.2d 301, 305 (4th Cir. 1973).

### b) Ordinary High Water Mark

■ Plaintiffs claim that the ordinary high-water mark determinations, reflected as m. s. l. elevation figures in each flowage easement document in issue, were erroneous and therefore entitles them to additional just compensation for resulting additional flowage easement takings (*see* note 3, *supra*).[27] There is no reliable evidence in the record that the Corps' OHWM determinations as to each property in issue were erroneous. Plaintiffs have failed to carry their burden in this regard and their erroneous OHWM contentions are accordingly rejected. *See United States v. 329.05 Acres of Land, supra; United States ex rel. T. V. A. v. 137 Acres of Land, supra.*

While not clear in their briefs and findings, plaintiffs ostensibly feel that the use of an erroneous OHWM by the Corps in these flowage easements was known, or should have been known, to the Corps at the time they were acquired, and thus constituted fraud and/or misrepresentation on the part of the Corps in obtaining easements from them under such circumstances.[28] There is absolutely no evidence in the

26. Plaintiffs contend, for example, that in order for the aerial survey results to have any efficacy, the aerial photographer would have to certify as to the camera lens setting, the person plotting the elevations and establishing contours would have to certify as to their accuracy, etc. Since this was not done, plaintiffs seem to argue, the data obtained from the survey must be deemed unreliable and therefore the flowage easement descriptions, which were based in some way on the aerial survey procedure, must be deemed inaccurate and unreliable. Plaintiffs' contention might have had some merit had the validity of the legal descriptions of the flowage easements been challenged by the results of an actual survey by a competent surveyor. This is the thrust of *Rhoads v. Virginia-Florida Corp.*, 476 F.2d 82, 84 (1973) relied on by plaintiffs. As this record now stands, there is no reliable and persuasive evidence that the flowage easement descriptions in issue are inaccurate or otherwise unreliable.

27. Obviously those plaintiffs who acquired the properties in issue after the flowage easements were acquired would not be entitled to additional compensation for any such additional

takings in any event (*see* note 22 and text, *supra*). Further, those plaintiffs whose flowage easement takings resulted from district court judgments have not shown any reason why *res judicata* should not bar their claims (*see* note 21 and text, *supra*). The district courts have jurisdiction to determine any such OHWM dispute. *See United States v. 21.54 Acres of Land*, 491 F.2d 301, 306–07 (4th Cir. 1973); *Vanada v. United States*, 202 Ct.Cl. 1121, 1122 (1973).

28. Plaintiffs in their briefs argue that, in any event, a mutual mistake of fact exists as to the correct OHWM and therefore the court should reform each flowage easement document to reflect said correct OHWM, citing *Higgs v. United States*, 212 Ct.Cl. 146, 150, 546 F.2d 373, 376 (1976), where reformation was allowed to correct clerical misdescriptions of property in a contract. Plaintiffs do not offer any correct OHWM determinations. More importantly, there is no mutual mistake of fact on which the court could predicate any such action in any event. Defendant and the Corps maintain that the OHWM determinations in issue are correct.

record to support these feelings, beliefs or allegations.

In their briefs, plaintiffs contend that the OHWM on the entire Ohio River is patently defective. Plaintiffs cite three cases in which, they say, courts have concluded that OHWM determinations by the Corps in certain Ohio River pool areas were defective. The cited cases are *Tri-State Materials Corp. v. United States*, 213 Ct.Cl. 1, 550 F.2d 1 (1977) (Racine Locks and Dam); *United States v. 21.54 Acres of Land, supra*, (Hannibal Locks and Dam); and *Vanada v. United States, supra*, (Newburgh Locks and Dam).[29] A reading of the first two cases discloses that the courts in those two cases did not find that the OHWM determinations of the Corps in those pool areas were erroneous or incorrect. Indeed, there were no determinative decisions involving the correctness of the OHWM in those two cases. The third cited case, as indicated in note 29, *supra*, has no precedential value, and even if it did, plaintiffs would not, on this record, fall within the pale of its holding. No case has been cited, and none has been found, where a court has concluded that the Corps' OHWM determinations on

the entire Ohio River are patently defective.

As to that category of plaintiffs who entered into flowage easement warranty deed agreements with the Corps, it appears that the statute of limitations bars any claim those plaintiffs may have for additional compensation emanating from said easements relating to the OHWM. This same defense would seem to have equal applicability to the claims of the other two categories of plaintiffs as well. The flowage easements in issue were all acquired by the Corps on or before September 5, 1967. The earliest petition in these cases was filed on July 16, 1975, more than 6 years after the acquisition of these flowage easements. Accordingly, 28 U.S.C. § 2501, without more, bars consideration of these OHWM claims. Plaintiffs' suggestion that the statute of limitations is not applicable to fifth amendment taking claims is clearly without merit. *See Soriano v. United States*, 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Nadler Foundry & Mach. Co. v. United States*, 143 Ct.Cl. 92, 95–96, 164 F.Supp. 249, 251–52 (1958).[30]

There is no reliable evidence in this record that the Corps' OHWM determinations are incorrect. It must be concluded that there was no mistake by the government and thus no mutual mistake and, accordingly, no basis for reformation. *See Fraass Surgical Mfg. Co. v. United States*, 215 Ct.Cl. 820, 825–29, 571 F.2d 34 (1978).

29. In *Vanada*, a trial judge of this court did find that as to one tract of land in the Newburgh pool the Corps' OHWM determination was erroneous as to a portion of land on said tract below the Corps' OHWM determination because the evidence showed this portion of land to have been farmed, and crops harvested for profit, over the course of at least 23 years. Applying the agricultural value test, citing, *inter alia, Borough of Ford City v. United States*, 345 F.2d 645 (3d Cir. 1965), *cert. denied*, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156, the trial judge concluded that this farmed portion of the tract must be deemed to be above the OHWM. Subsequent to the rendition of the trial judge's recommended decision and conclusion of law, the parties in *Vanada* settled the case. *See* 206 Ct.Cl. 819. Accordingly, there was no decision on the merits as to this OHWM issue, and the trial judge's recommended decision is not a judgment of the court under these circumstanc-

es. *See Pitcairn v. United States*, 212 Ct.Cl. 168, 195–96, 547 F.2d 1106, 1123–24 (1976). There is no reliable evidence in the record that the Corps' OHWM determinations on any of the properties in issue embraced lands that were farmed and/or cropped below said OHWM determinations. On this record, plaintiffs, in any event, would not meet the test utilized by the trial judge in his *Vanada* recommended opinion.

30. Defendant does not raise the defense of limitations as to the erosion claims advanced by plaintiffs. It has been held in one case that a taking occurs when a dam was completed and put in operation by the filling of the pool. *See County Court of Marion County W. Va. v. United States*, 53 Ct.Cl. 120, 150 (1918); *but see United States v. Dickenson*, 331 U.S. 745, 747–49, 67 S.Ct. 1382, 1384–1385, 91 L.Ed. 1789 (1947). In the Cannelton pool area, the pool rise was completed on August 17, 1972. The plaintiffs in this pool area claimed they began to notice erosion on their banks in 1972 or thereabouts. Since the petitions involving Cannelton pool plaintiffs were filed within 6 years of August 17, 1972, there is no question but that their erosion claims are timely. However, when the erosion claims of the Meldahl

The OHWM determinations in issue were plainly stated in the flowage easement documents. They were not concealed from plaintiffs. Further, the OHWM on a riverbank is a physical fact, subject to determination by inspection of the riverbank. *Kelley's Creek & N.W.R.R. Co. v. United States*, 100 Ct.Cl. 396, 405–06 (1944). It is not unreasonable to expect that plaintiffs, as riparian landowners, were familiar to some degree with their riverbanks. Given the Corps' OHWM determinations, plaintiffs had all the information necessary and available to them to contest these determinations at the time the flowage easements were obtained from them. *See Hart v. United States*, 585 F.2d 1280, 1283 (5th Cir. 1978). It is difficult under such circumstances to accept plaintiffs' views that they were deceived or misled by the Corps' OHWM determinations. *See Butler v. United States*, 213 Ct.Cl. 379, 386, 551 F.2d 286, 290 (1977). It is to be noted that other riparian landowners on the Ohio River, from whom the Corps acquired flowage easements in connection with its high-lift dam modernization program, challenged the Corps' OHWM determinations in a timely manner when they believed them to be incorrect. *See United States v. 21.54 Acres of Land, supra*, 491 F.2d at 303 (Hannibal Locks and Dam); *Vanada v. United States*, 202 Ct.Cl. 1121 (1973); and 206 Ct.Cl. 819 (1975) (Newburgh Locks and Dam). Plaintiffs could have, and should have, done so before the limitations period ran on them. Accordingly, since their OHWM causes of action accrued at dates more than 6 years prior to their instituting suits in this court, these claims are time barred. Plaintiffs have offered no acceptable reasons why the running of the statute of limitations should be suspended or not applied in these cases.

*See Braude v. United States*, 218 Ct.Cl. 270, 273–74, 277–78, 585 F.2d 1049, 1051–52, 1053–54 (1978); *Japanese War Notes Claimants Ass'n v. United States*, 178 Ct.Cl. 630, 634–36, 373 F.2d 356, 358–60 (1967). The passage of time, the raising of the pools and the effects of floods, etc., have undoubtedly changed the riverbanks in issue such that today one would be unable to inspect these riverbanks and determine where in 1965 or before (Meldahl pool), or 1972 and before (Cannelton pool) the OHWM was. The statute of limitations was designed to cover just such situations.

In summary, after careful consideration of the voluminous trial record in these cases and giving due regard to the proposed findings of fact and briefs of the parties, it is concluded that plaintiffs are not entitled to a favorable liability determination relative to their allegations that the Corps was guilty of fraud and misrepresentation in obtaining flowage easements on the properties in issue.

---

pool plaintiffs accrued are not as easily determined on this record. The Meldahl pool rise was completed on March 28, 1965. Unlike the Cannelton pool plaintiffs, some Meldahl pool plaintiffs testified generally that they did not notice any erosion manifestations until 1972 or thereabouts even though the water level had been raised some 7 years previously. One Meldahl pool plaintiff testified he first noticed erosion incidents in 1967. Because a number of Meldahl pool plaintiffs did not testify or ac-

quire their property after the dam was operational, it is difficult to draw conclusions as to when erosion manifested itself on the banks sufficient to start the running of the limitations period. Under such circumstances, and since defendant does not raise limitations as a defense to the erosion claims, limitations will not be deemed to apply to the claims of the Meldahl pool plaintiffs although the question is a sticky one.